**2021 IL 125621**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125621)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
CHARLES B. PALMER, Appellant.

*Opinion filed April 15, 2021.*

JUSTICE CARTER delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Theis and Neville concurred in the judgment and opinion.

Justice Michael J. Burke specially concurred, with opinion, joined by Justices Garman and Overstreet.

**OPINION**

¶ 1      In this appeal, we are asked to decide whether the legislature intended section 2-702(g)(3) of the Code of Civil Procedure (Code) (735 ILCS 5/2-702(g)(3) (West 2018)) to require a petitioner seeking a certificate of innocence to prove that he or

she was innocent of the offense only as it was originally charged or innocent of every conceivable theory of criminal liability for that offense. For the following reasons, we conclude that subsection (g)(3) requires a petitioner to prove innocence only of the offense as it was charged in the underlying criminal proceeding. We reverse the judgments of the appellate court and circuit court of Macon County that reached the opposite conclusion and remand to the circuit court with directions to issue petitioner a certificate of innocence.

¶ 2                                              I. BACKGROUND

¶ 3         On August 26, 1998, the victim, William Helmbacher, reported a burglary of his apartment to police officers in Decatur, Illinois. The next night, around 10:30 p.m. on August 27, the victim was found beaten to death inside his apartment.

¶ 4         Two weeks after the murder, a garbage bag that contained items stolen from Helmbacher's apartment was recovered less than a mile from the apartment. Investigators recovered a fingerprint from the garbage bag that was determined to belong to Ray Taylor, who lived in Helmbacher's apartment building. When Taylor was questioned by police officers, he claimed that petitioner, who is Taylor's cousin, confessed to killing Helmbacher during a robbery on August 27.

¶ 5         Ultimately, the State charged petitioner with five counts of first degree murder in connection with Helmbacher's death. In relevant part, the State alleged that on August 27, 1998, petitioner (1) "with the intent to kill or do great bodily harm to [the victim], repeatedly struck [him] on the head, thereby causing the death of [the victim]"; (2) "without lawful justification, repeatedly struck [the victim] on the head, knowing said act would cause the death of [the victim], thereby causing the death of [the victim]"; (3) "without lawful justification, repeatedly struck [the victim] on the head, knowing such act created a strong probability of death or great bodily harm to [the victim], thereby causing the death of the [the victim]"; (4) "without lawful justification, while committing or attempting to commit a forcible felony, robbery, *** repeatedly struck [the victim] on the head and thereby caused the death of the [the victim]"; and (5) "without lawful justification, while committing or attempting to commit a forcible felony, residential burglary, *** repeatedly struck [the victim] on the head and thereby caused the death of [the victim]." The State also charged petitioner with a single count of residential

burglary, alleging that petitioner knowingly and without authority entered the dwelling place of the victim with the intent to commit a theft therein on August 26, 1998.

¶ 6                          A. Trial Proceedings

¶ 7      At petitioner's jury trial, the State argued that on August 26, 1998, petitioner and Taylor burgled the victim's apartment. The next night, August 27, petitioner returned and killed the victim with a hammer.

¶ 8      Joseph Moyer testified that, on the night of the murder, he and Douglas Lee were collecting rent at several apartment buildings owned by Lee, including the victim's building. At around 9:45 p.m., they arrived at the victim's apartment and knocked at the door, but no one answered. The two men left to collect rent at other apartments and returned to the victim's apartment approximately an hour later. Moyer looked inside the apartment's window and saw a partially eaten sandwich on a table and shoes on the floor. According to Moyer, Lee decided to use his owner's key to open the victim's apartment door. When Lee opened the door, he discovered the deceased victim on the floor. After discovering the victim's body, the two men went to the neighboring apartment and asked the occupants to call for emergency personnel and law enforcement.

¶ 9      On cross-examination, Moyer acknowledged that he had a prior felony conviction for burglary. Moyer confirmed that when he and Lee arrived at the victim's apartment the door was locked and there were no signs of forced entry. When asked why Moyer and Lee were collecting rent around 10 p.m., Moyer explained that the victim was responsible for collecting rent from Lee's tenants, but the victim failed to do so in a timely fashion. Consequently, Lee and Moyer were working together that night to collect the unpaid rent. Moyer confirmed that Lee was "upset" with the victim for not collecting the rent.

¶ 10      Ray Taylor testified that he was petitioner's cousin. Taylor lived in an apartment upstairs from the victim's apartment. At the time of petitioner's trial, Taylor was charged with the August 26 burglary of the victim's apartment. Taylor agreed to testify in petitioner's murder case, but he was not made any specific

promises in connection with his testimony. Taylor acknowledged that he had a prior felony conviction for aggravated battery.

¶ 11 Taylor testified that on August 26, 1998, petitioner told Taylor that he was going to break into the victim's apartment. Taylor saw petitioner enter the victim's apartment through a window, and then petitioner came out the front door. Petitioner asked Taylor to "look out for him." Taylor claimed that he "stood there" outside the victim's apartment and then returned to his upstairs apartment. Shortly thereafter, petitioner arrived at Taylor's apartment with beer and "some items like some cards, [and] some change in a jar." Petitioner kept the change and beer but discarded the other items in a garbage bag that Taylor gave him. Petitioner and Taylor drank the beer, and then they discarded the garbage bag in a dumpster a few blocks away.

¶ 12 The next day, August 27, Taylor saw petitioner "early in the day" and talked to him briefly outside Taylor's apartment. Taylor did not see petitioner again until "later that evening" when Taylor saw petitioner at another apartment. Taylor noticed that petitioner was wearing different clothes and shoes that appeared too small and did not fit properly. According to Taylor, petitioner claimed that he "had to beat the dude to death." When Taylor asked petitioner who he was talking about, petitioner told Taylor that he killed the victim and took $11. Taylor also asked petitioner about his shoes, and petitioner replied that "blood was everywhere."

¶ 13 On cross-examination, Taylor admitted that on both the night of the murder and a few days later Taylor denied to police officers that he had any information about the victim's murder. Taylor further admitted that he did not implicate petitioner in the murder and burglary until after police discovered Taylor's fingerprint on the discarded garbage bag containing items taken from the victim's apartment.

¶ 14 Michael Callaway testified that he lived in the victim's apartment building and petitioner was at Callaway's apartment on the night of the murder. At some point in the evening, Callaway left his apartment and went to a liquor store for about 45 minutes. When Callaway returned, petitioner was in his apartment. Callaway noticed that petitioner was wearing one of Callaway's shirts inside out. Callaway told petitioner to wash his own clothes and put them back on. Callaway later saw petitioner washing clothes in the bathtub.

¶ 15 On cross-examination, Callaway stated that petitioner arrived at his apartment around 10 p.m. and it was "about dark" outside but Callaway could not remember the exact time of petitioner's arrival. Callaway did not see any blood on petitioner, and petitioner did not make any statements about the victim's murder. Callaway did not know whether petitioner ever left his apartment. Callaway conceded that he could not remember whether petitioner was wearing his shirt the night of the murder or the following day.

¶ 16 The State also called several detectives and police officers who worked on the victim's murder investigation and provided the following information. The victim's body was on the floor approximately three feet from the front door, and there was no evidence of a forced entry into the apartment. A large amount of blood was on the floor near the victim's body, and blood was also splattered on the door. A hammer was recovered a short distance from the victim's body. Investigators placed bags over both of the victim's hands to preserve forensic evidence.

¶ 17 The victim's autopsy demonstrated that he died as a result of brain trauma compatible with multiple strikes from a hammer. The forensic examiner collected from the victim fingernail scrapings, fingerprints, and a blood standard that was sent to the Illinois State Police crime laboratory.

¶ 18 Decatur police detective Tim Carlton testified that he interviewed petitioner on September 22, about three weeks after the murder. During that interview, Carlton told petitioner that Taylor had implicated petitioner in the August 26 burglary of the victim's apartment and the victim's murder on August 27. Petitioner denied involvement in both crimes. Based on information received from Taylor, Carlton also took into evidence the tennis shoes that petitioner was wearing during the interview. After petitioner took off his shoes, Carlton observed two small red stains on the shoes.

¶ 19 On cross-examination, Carlton confirmed that petitioner denied any involvement or knowledge about the burglary or murder of the victim. Carlton also confirmed that the first crime laboratory report on petitioner's tennis shoes stated that "no human blood [was] found on the tennis shoes." After that report, Carlton instructed the crime laboratory to "take [the shoes] apart" and retest for the presence of blood. Carlton acknowledged that he did not direct the laboratory to test the blood-like substance recovered from the victim's fingernail scrapings.

¶ 20        On redirect examination, Carlton testified that several items recovered from the victim's body had a blood-like substance that was not tested, including the victim's belt, a hat, a bag, pieces of hair, and the hammer recovered near the body. Carlton did not know why the substances on those items were not tested but observed that "there was pretty much blood everywhere on the [victim's] body."

¶ 21        On recross-examination, Carlton confirmed that petitioner's tennis shoes were not taken into evidence until September 22. Carlton acknowledged it was "more likely" that the suspect's blood or other forensic evidence would be found under the victim's fingernails rather than on petitioner's shoes collected about three weeks after the murder.

¶ 22        Jennifer Lu testified that she analyzed petitioner's tennis shoes for the Illinois State Police Springfield forensic science laboratory on September 25, 1998. Lu examined the shoes for blood and tested several reddish-brown stains on the shoes. All of the test results came back negative for blood, and Lu repackaged the shoes and returned them to the evidence vault. Eventually, the shoes were sent back to the Decatur Police Department. In November 1998, Lu examined the shoes a second time because she was asked by the Decatur Police Department to "tear the shoes apart and examine them for blood." After Lu took the shoes apart, she discovered three stains that appeared to be blood underneath a piece of mesh. Lu tested the stains and confirmed they were from human blood. A subsequent DNA analysis of the recovered blood stains from petitioner's shoes established that they were from the victim's blood.

¶ 23        On cross-examination, Lu confirmed that, when she first examined petitioner's shoes in September, she conducted a "thorough" examination of the exterior and interior of the shoes, tested the visible stains, and found no evidence of human blood on the shoes. Lu also found a blood-like substance in the victim's fingernail scrapings, but she did not test that substance. When Lu received the shoes a second time for additional testing, "they wanted me to tear the shoes apart[,] which isn't usual procedure, but I agreed to" perform the request.

¶ 24        On redirect examination, Lu explained that "[t]he reason we don't normally tear the shoes apart [is] because it's very time consuming, very difficult, and often dangerous. It involves scalpels and scissors."

¶ 25    Petitioner testified in his own defense. Petitioner denied any involvement in the August 26 burglary of the victim's apartment or the victim's murder on August 27. Petitioner had never seen the victim until police officers showed him the victim's picture. According to petitioner, he spent most of the day on August 26, 1998, asleep in Taylor's apartment because petitioner was sick. Petitioner explained that his stomach was upset, he vomited, and he was unable to eat anything. Petitioner testified that he stayed inside Taylor's apartment the entire day and never left.

¶ 26    Petitioner spent the night of August 26 in Taylor's apartment and woke up the next day, August 27, around 11 a.m. or noon. Petitioner still felt ill but eventually left Taylor's apartment in the afternoon. Petitioner went to Callaway's apartment and put on a pair of Callaway's pants after he washed them. Petitioner also put on one of Callaway's shirts that he turned inside out because it had a cartoon character on the front. Petitioner denied washing any of his own clothes the night of the murder.

¶ 27    On cross-examination, petitioner testified that he was released from jail in June 1998. In August 1998, petitioner rented a room in a boarding house, but he also stayed at Taylor's apartment and Callaway's apartment. Petitioner confirmed that police officers took a pair of his shoes during the investigation. Petitioner did not remember if he ever let anyone else wear those shoes. When asked why he changed clothes at Callaway's apartment, petitioner stated that he had worn the same pants for three days. Petitioner explained that he and Callaway often wore each other's clothing.

¶ 28    The jury found petitioner not guilty of residential burglary and guilty of first degree murder. The trial court sentenced petitioner to life imprisonment for first degree murder (count I).

¶ 29                        B. Appellate and Postconviction Proceedings

¶ 30    On direct appeal, the appellate court affirmed petitioner's conviction and sentence. *People v. Palmer*, No. 4-00-0634 (2001) (unpublished order under Illinois Supreme Court Rule 23). Petitioner's postconviction petition was summarily dismissed, and the appellate court affirmed the dismissal. *People v. Palmer*, 352 Ill. App. 3d 877, 884 (2004).

¶ 31 In June 2010, petitioner filed a motion for forensic testing of previously untested evidence under section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 116-3 (West 2010)). The circuit court granted his motion in part, allowing testing of the material from the victim's fingernail scrapings. The court noted that the victim suffered defensive wounds suggesting a physical struggle with his assailant. Consistent with the court's order, Cellmark Forensic Services performed a DNA analysis of the fingernail scrapings collected from the victim. The analysis determined that the victim's fingernail scrapings contained two DNA profiles, one from the victim and the other from a foreign contributor. Petitioner was excluded as a possible contributor of the DNA found underneath the victim's fingernails.

¶ 32 In June 2014, petitioner filed a second motion for DNA testing on the hairs and blood-like substance found in the bags that were placed around the victim's hands. After the court granted his request, Cellmark analyzed that evidence for DNA. The analysis determined that two of the recovered hairs yielded no data but that a third hair was from someone other than the victim or petitioner.

¶ 33 In July 2016, petitioner filed a successive postconviction petition that sought a new criminal trial based on the new forensic evidence. The circuit court granted petitioner leave to file the successive petition. In November 2016, the circuit court vacated petitioner's conviction and sentence after the State conceded that the new evidence warranted a new trial.

¶ 34 On November 23, 2016, the State moved to dismiss the charges against petitioner without prejudice. The State explained that petitioner was excluded as a contributor to the DNA recovered under the victim's fingernails and that "the victim's cause of death was a violent bludgeoning by a hammer, resulting in defensive wounds to the victim, which is indicative of a physical struggle with the perpetrator." After finishing a follow-up investigation and consultation with the Decatur Police Department, the State concluded that "there is insufficient evidence to prove [petitioner's] case beyond a reasonable doubt."

¶ 35 On the same day, the circuit court entered an order that vacated and dismissed all charges against petitioner. The court further ordered petitioner's immediate release from custody.

¶ 36                          C. Petition for a Certificate of Innocence

¶ 37        On August 30, 2018, petitioner filed an amended petition seeking a certificate of innocence pursuant to section 2-702 of the Code (735 ILCS 5/2-702 (West 2018)).[1] This petition is the subject of the instant appeal.

¶ 38        In his amended petition, petitioner argued that the new forensic DNA evidence "conclusively established" that petitioner was not involved in the victim's murder. Because the victim sustained defensive wounds, the perpetrator likely left forensic evidence on the victim's body after the attack. As the new forensic testing demonstrated, however, the DNA evidence collected from under the victim's fingernails and hairs collected from his hands demonstrated that the recovered material did not come from petitioner. Petitioner also alleged that the State's initial suspect, the victim's landlord Douglas Lee, "has not been similarly excluded."

¶ 39        Petitioner asserted that the State's remaining evidence against him was "weak" and "utterly unreliable." The shoes were the only physical evidence connecting petitioner to the crime, but petitioner contended that the evidence collected from the shoes was unreliable for two reasons. First, it was suspicious that the shoes were sent to the lab twice, but there was never a request to test the fingernail scrapings or hairs found on the victim. Although the first exam of the shoes detected no blood, the police made an unusual second request to "tear" the shoes apart, and a small amount of the victim's blood was then detected underneath a piece of mesh. Implying someone had placed the victim's blood on petitioner's shoes between the first and second examinations, petitioner stated "[t]he fact that this blood appeared only after an initial round of testing is further reason to doubt the reliability of this [blood] evidence."

¶ 40        Second, petitioner alleged that there was conflicting evidence on whether the shoes that were tested were the same ones taken from petitioner. Petitioner noted that lab reports described the shoes as "black and white," but Taylor and petitioner both testified that his shoes were "red and white." Other witnesses testified that the shoes were "white."

_____

[1]Petitioner timely filed an initial petition on June 16, 2017.

¶ 41    The only other evidence supporting the State's theory of petitioner's guilt was Taylor's testimony, but petitioner claimed that Taylor was "a person of dubious credibility." Taylor had multiple prior felony convictions and was also a suspect in the case. According to petitioner, Taylor had a motive to incriminate petitioner because Taylor's fingerprint was found on the garbage bag that contained items stolen from the victim's apartment. Taylor also initially denied any involvement or knowledge of the murder and changed his story only after he was confronted with the evidence of his fingerprint on the garbage bag. Thus, petitioner asserted that Taylor's testimony was "simply meaningless."

¶ 42    In response, the State disagreed with petitioner's characterization of the evidence. The State argued that the evidence demonstrated that the shoes tested and presented as evidence were petitioner's shoes and that petitioner's suggestion that police planted the blood on his shoes was "a baseless accusation that is unsupported by the evidence." The State contended that Taylor's trial testimony was consistent with his statement given to police officers and Callaway's testimony. Although Taylor originally denied any involvement or knowledge of the murder, Taylor "understandably was not eager to implicate his first cousin in a homicide."

¶ 43    The State noted that petitioner's own testimony placed him in the victim's apartment building on the day of the murder. According to the State, petitioner testified inconsistently on his actions that day and why he changed his clothing at Callaway's apartment. To the extent petitioner sought to implicate Douglas Lee in the victim's murder, the State clarified that the DNA report on the forensic material found under the victim's fingernails provided that "no conclusions [could] be made" in regard to Lee's DNA profile. The report, however, did exclude Lee as a contributor of the hair recovered from the victim's hands.

¶ 44    The State further argued that the new forensic evidence did not establish petitioner's innocence by a preponderance of the evidence. While the State conceded that the new evidence established petitioner was not the primary assailant who killed the victim, the State asserted that the evidence "does nothing to refute the argument that petitioner may be guilty of the victim's murder as an accessory or as a participant in a felony murder." Because the source of the DNA recovered from the hair and fingernail scrapings remained unknown, the State posited that the new evidence did not refute a theory that petitioner entered the victim's apartment

with an unknown person to commit another burglary or robbery that resulted in the victim's murder.

¶ 45     Observing that the victim's blood was found underneath mesh on the side of petitioner's shoe, the State maintained that petitioner was in close proximity to the victim during the murder because the victim's blood splattered on his shoe and dripped through the mesh. In addition, cleaning the shoes after the murder would not have removed the blood underneath the mesh.

¶ 46     After a hearing in January 2019, the circuit court requested supplemental authority on the issue of whether the State was allowed to change its theory of petitioner's guilt in the proceedings for the certificate of innocence. Petitioner filed a supplemental brief in support of his amended petition, arguing that the State could not change its theory of petitioner's guilt for the first time in those proceedings without violating his due process rights. Petitioner also argued that the State's attempt to raise a new theory of his guilt was barred by the doctrine of judicial estoppel.

¶ 47     On February 14, 2019, the circuit court denied petitioner's amended petition seeking a certificate of innocence. The court rejected petitioner's contention that the State was limited to arguing that petitioner was guilty of first degree murder as charged in his criminal trial. The court concluded as follows:

> "In reviewing all of the evidence presented at trial, the DNA analyzed after the trial[,] and the arguments made, the court understands why the State has not decided to retry the case at this time with the evidence that is available and the burden [of proof] beyond a reasonable doubt. Having said that, the court cannot find that [petitioner] has proven by the preponderance of the evidence that [petitioner] has established that he is innocent of the charge of murder."

¶ 48     On appeal, the appellate court affirmed. Rejecting petitioner's argument that the State could not change its theory of petitioner's guilt, the court concluded that petitioner had to prove by a preponderance of the evidence that he was neither the principal nor an accomplice in the commission of the charged offense because "[t]he principal and the accomplice are, in the eyes of the law, one and the same." 2019 IL App (4th) 190148, ¶ 150. The court also rejected petitioner's due process argument and his reliance on the doctrine of judicial estoppel. *Id.* ¶¶ 154-58, 161.

The appellate court concluded that the trial court did not abuse its discretion when it found that petitioner failed to establish that he did not commit first degree murder on a theory of accountability or felony murder. *Id.* ¶¶ 172-73.

¶ 49        We allowed petitioner's petition for leave to appeal pursuant to Illinois Supreme Court Rules 315 (eff. Oct. 1, 2019) and 612 (eff. July 1, 2017). First Defense Legal Aid and 19 criminal defense lawyers and exonerees were granted leave to file *amicus curiae* briefs in support of petitioner's position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). The City of Decatur was granted leave to file an *amicus curiae* brief in support of the State's position. *Id.*

¶ 50                                    II. ANALYSIS

¶ 51        On appeal, petitioner's primary argument is that section 2-702(g)(3) of the Code (735 ILCS 5/2-702(g)(3) (West 2018)) should be construed to require that he must "prove his innocence of the particular factual offense with which he was actually charged and that led to his wrongful conviction." In addition, petitioner argues that the State's position that subsection (g)(3) requires proof that he was innocent of novel and uncharged allegations of criminal liability is foreclosed by the doctrine of judicial estoppel and violates principles of due process. Alternatively, if this court agrees with the State's interpretation, petitioner contends that the State failed to present any evidence to support its new theory of his guilt.

¶ 52        We first address the central dispute in this case—the proper construction of subsection (g)(3). The parties disagree on what a petitioner must demonstrate to prove by a preponderance of the evidence that he or she "is innocent of the offenses charged in the indictment or information or his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State." *Id.*

¶ 53        An issue of statutory construction presents a question of law that is subject to *de novo* review. *People v. Johnson*, 2019 IL 123318, ¶ 14. The fundamental goal of statutory construction is to ascertain and give effect to the legislature's intent, best indicated by the plain and ordinary meaning of the statutory language. *People v. Reese*, 2017 IL 120011, ¶ 30. A reviewing court may also discern legislative intent by considering the purpose of the statute, the problems to be remedied, and

- 12 -

the consequences of interpretating the statute one way or another. *People v. Bradford*, 2016 IL 118674, ¶ 15. It is presumed that the legislature did not intend absurd, inconvenient, or unjust results. *People v. Williams*, 2016 IL 118375, ¶ 15.

¶ 54    Our analysis begins with an overview of the statutory framework that governs the issuance of a certificate of innocence pursuant to section 2-702. The statute begins with a clear statement of legislative intent:

> "The General Assembly finds and declares that innocent persons who have been wrongly convicted of crimes in Illinois and subsequently imprisoned have been frustrated in seeking legal redress due to a variety of substantive and technical obstacles in the law and that such persons should have an available avenue to obtain a finding of innocence so that they may obtain relief through a petition in the Court of Claims." 735 ILCS 5/2-702(a) (West 2018).

The statute further instructs that a circuit court presented with a petition seeking a certificate of innocence "shall, in the interest of justice, give due consideration to difficulties of proof caused by the passage of time, the death or unavailability of witnesses, the destruction of evidence or other factors not caused by such persons or those acting on their behalf." *Id.*

¶ 55    Consistent with these goals, section 2-702 authorizes any person convicted and subsequently imprisoned for a crime that they did not commit to file a petition seeking a certificate of innocence finding that the petitioner was innocent of all offenses for which they were incarcerated. *Id.* § 2-702(b). To present a claim seeking a certificate of innocence, the petitioner must attach supporting documentation demonstrating certain prerequisites, including the timeliness of the claim. *Id.* § 2-702(c), (i). The petition must also be verified by the petitioner and state sufficient facts to permit the court to find that the petitioner is likely to succeed at trial in proving that the petitioner is innocent of the offenses charged in the indictment. *Id.* § 2-702(d).

¶ 56    A copy of the petition shall be served on the Attorney General and the state's attorney of the county where the conviction was obtained, and either entity has the right to intervene as a party in the proceeding. *Id.* § 2-702(e). In any hearing on the petition, the court is allowed to take judicial notice of prior sworn testimony or

evidence admitted in the criminal proceedings that resulted in the alleged wrongful conviction. *Id.* § 2-702(f).

¶ 57 To obtain a certificate of innocence, the petitioner must prove by a preponderance of the evidence the following four elements:

> "(1) the petitioner was convicted of one or more felonies by the State of Illinois and subsequently sentenced to a term of imprisonment, and has served all or any part of the sentence;

> (2)(A) the judgment was reversed or vacated, and the indictment or information dismissed or, if a new trial was ordered, either the petitioner was found not guilty at the new trial or the petitioner was not retried and the indictment or information dismissed; or (B) the statute, or application thereof, on which the indictment or information was based violated the Constitution of the United States or the State of Illinois;

> (3) the petitioner is innocent of the offenses charged in the indictment or information or his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State; and

> (4) the petitioner did not by his or her own conduct voluntarily cause or bring about his or her conviction." *Id.* § 2-702(g)(1)-(4).

¶ 58 Here, the parties agree that petitioner has met three of the four elements required to obtain a certificate of innocence under section 2-702(g). The only point of disagreement involves subsection (g)(3)—whether petitioner has proved by a preponderance of the evidence that he is "innocent of the offenses charged in the indictment or information." *Id.* § 2-702(g)(3).

¶ 59 Petitioner argues that subsection (g)(3) should be construed to require proof only of his innocence of the specific factual offense charged in his criminal case. Petitioner urges this court to reject the State's argument, accepted by the appellate court, that subsection (g)(3) requires him to prove that he is innocent of every conceivable theory of criminal liability for the offense. Because petitioner was charged with first degree murder on the basis that he personally beat the victim to death and the State now concedes that petitioner was not the principal attacker, petitioner argues that he is entitled to a certificate of innocence.

¶ 60    Focusing on the language of subsection (g)(3), petitioner observes that the word "offenses" is modified by the words "charged in the indictment or information." In addition, the legislature used the same phrase "offenses charged in the indictment or information" in subsection (d). See *id.* § 2-702(d). Based on the repeated use of this modifying language, petitioner argues that the legislature intended a petitioner to prove his or her innocence only of those offenses actually described in the charging document. According to petitioner, the legislature plainly contemplated that courts would reference the specific factual content of charging documents in analyzing subsection (g)(3).

¶ 61    In response, the State argues that subsection (g)(3) requires a petitioner to prove his innocence of the offense charged and "not merely innocent of the specific factual allegations." The State observes subsection (g)(3) requires proof that the petitioner is "innocent of the *offenses charged* in the indictment or information." (Emphasis added). *Id.* § 2-702(g)(3).

¶ 62    Applying the plain meaning to that language, the State argues that petitioner in this case must prove himself innocent of the offense charged—first degree murder. Citing *People v. Ceja*, 204 Ill. 2d 332, 361 (2003), the State notes that this court has held "[i]t is proper to charge a defendant as a principal even though the proof is that the defendant was only an accomplice. [Citations.] Courts permit this pleading practice because accountability is not a separate offense, but merely an alternative manner of proving a defendant guilty of the substantive offense."

¶ 63    The State asserts that there is a legal distinction between the offense, or crime, and the facts alleged in a charging instrument. Here, the offense charged was first degree murder, and the original allegation that petitioner beat the victim to death with a hammer was "merely a means of committing the charged offense." The State argues that petitioner must prove his innocence of first degree murder as both principal and accomplice under subsection (g)(3) because accountability is not a separate offense but rather an alternative manner of proving a criminal defendant guilty of the substantive offense.

¶ 64    After reviewing the language of subsection (g)(3) and section 2-702 as a whole, we conclude that petitioner's interpretation best comports with the legislature's intent. See *Reese*, 2017 IL 120011, ¶ 30 (the fundamental goal of statutory construction is to give effect to legislative intent). In relevant part, subsection (g)(3)

requires proof by a preponderance of the evidence that "the petitioner is innocent of the offenses charged in the indictment or information." 735 ILCS 5/2-702(g)(3) (West 2018). We agree with petitioner that, because the word "offenses" is modified by the phrase "charged in the indictment or information," the legislature intended that a petitioner establish his or her innocence of the offense on the factual basis *charged* in the indictment or information. This construction is also consistent with the legislature's express goal of providing those individuals who are wrongfully convicted with "an available avenue to obtain a finding of innocence so that they may obtain relief through a petition in the Court of Claims." *Id.* § 2-702(a).

¶ 65    In contrast, the State's interpretation of subsection (g)(3) would defeat the legislative purpose of section 2-702 by effectively imposing a technical legal obstacle on a petitioner seeking relief from a wrongful conviction. The State maintains that under subsection (g)(3) it may assert for the first time that petitioner was guilty of first degree murder as an accomplice to an unidentified third party.

¶ 66    We disagree. It is undisputed that this theory of petitioner's guilt was never charged or presented to the trier of fact in the underlying criminal proceedings. To the contrary, the State argued at petitioner's jury trial that petitioner alone beat the victim to death with the hammer. The State's key trial witness, Ray Taylor, claimed that petitioner admitted to beating the victim to death. Taylor did not indicate that any other individual was involved in the victim's murder.

¶ 67    Because of the State's chosen strategy at petitioner's jury trial, there is no evidence or argument from either party on whether petitioner acted as an accomplice when the victim was murdered. In other words, the record is devoid of any meaningful evidence or argument to assist a reviewing court in deciding whether first degree murder as an accomplice has been disproven by petitioner in this case. See *id.* § 2-702(f) (during a hearing on the petition for a certificate of innocence, the reviewing court is permitted to take judicial notice of prior sworn testimony or evidence admitted in the underlying criminal proceedings that resulted in the alleged wrongful conviction). As petitioner argues, he cannot be expected to have access to the evidence necessary to disprove a theory of guilt that was never charged or presented during the original criminal proceedings.

¶ 68    Put simply, it is unreasonable to conclude that the legislature intended subsection (g)(3) to require a petitioner to prove his innocence of a novel theory of

guilt that was never charged or presented to the trier of fact. In fact, the legislature plainly stated its intent to ameliorate, not impose, technical and substantive obstacles to petitioners seeking relief from a wrongful conviction. *Id.* § 2-702(a). The legislature also instructed a court reviewing a petition for a certificate of innocence to give "due consideration to difficulties of proof" caused by the passage of time, unavailability of witnesses, the destruction of evidence, or other factors not caused by the petitioner. *Id.* The State's position contradicts both of those legislative directives. Necessarily, then, we reject the State's interpretation of subsection (g)(3). See *Bradford*, 2016 IL 118674, ¶ 15 (when construing a statute, a reviewing court may consider the consequences of interpreting a statute one way or another).

¶ 69     The State also cites our decision in *Ceja*, 204 Ill. 2d 332, to support its position. In *Ceja*, this court recognized that it is permissible to charge a criminal defendant as a principal even though the proof is that the defendant was only an accomplice because "accountability is not a separate offense, but merely an alternative manner of proving a defendant guilty of the substantive offense." *Id.* at 361.

¶ 70     The State's reliance on *Ceja* is misplaced for several reasons. First, *Ceja* was a direct appeal from a criminal conviction, and the statements relied on by the State were made in the context of our analysis of the defendant's argument on jury instructions. *Id.* at 360. Second, we explained in *Ceja* that "[a] defendant charged as a principal can be convicted on a theory of accountability *if supported by the evidence*." (Emphasis added.) *Id.* at 361. Third, while the indictment in *Ceja* charged the defendant as a principal, "the State prosecuted defendant under a theory of accountability" during the criminal trial. *Id.*

¶ 71     In stark contrast to *Ceja*, the State in this case did not present any evidence or argument at petitioner's criminal trial on an accountability theory. The State also declined to recharge or retry petitioner as an accomplice to murder after his conviction was reversed and vacated. Instead, the State is advancing its accountability argument for the first time in petitioner's attempt to obtain a certificate of innocence. *Ceja* does not support that argument.

¶ 72     In summary, we hold that subsection (g)(3) requires a petitioner to prove by a preponderance of the evidence his or her innocence of the offense as it was charged in the indictment or information that resulted in the wrongful criminal conviction.

Here, defendant was charged with five counts of first degree murder. Each of those counts alleged, in relevant part, that petitioner repeatedly struck the victim on the head and caused the victim's death. The jury convicted petitioner of first degree murder. The circuit court sentenced petitioner to natural life imprisonment on count I, alleging petitioner "without lawful justification and with the intent to kill or do great bodily harm to [the victim], repeatedly struck [the victim] on the head, thereby causing the death of [the victim]." Those allegations, as charged and prosecuted in petitioner's criminal trial, are the proper focus of subsection (g)(3).

¶ 73      The State does not contest petitioner's substantive argument that the new forensic DNA evidence demonstrates that petitioner did not repeatedly strike the victim on the head, as petitioner was originally charged and convicted. Thus, the State implicitly concedes that, if this court accepts petitioner's interpretation of subsection (g)(3), petitioner has satisfied that provision. The parties also agree that petitioner has satisfied the remaining requirements for obtaining a certificate of innocence. For purposes of this controversy, that ends our inquiry. Petitioner is entitled to a certificate of innocence because he has satisfied all four statutory prerequisites. 735 ILCS 5/2-702(g)(1)-(4) (West 2018).

¶ 74      Although we have determined that petitioner is entitled to a certificate of innocence on that basis, we choose to address the parties' arguments on the doctrine of judicial estoppel to provide guidance to the circuit court in future proceedings under section 2-702. This court has stated that "the uniformly recognized purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from 'deliberately changing positions' according to the exigencies of the moment." (Internal quotation marks omitted.) *Seymour v. Collins*, 2015 IL 118432, ¶ 36. Generally, judicial estoppel applies when the party to be estopped has (1) taken two positions (2) that are factually inconsistent (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged and (5) having succeeded in the first proceeding and received some benefit from it. *People v. Caballero*, 206 Ill. 2d 65, 80 (2002). We review a court's decision on whether to apply the doctrine of judicial estoppel for an abuse of discretion. *Seymour*, 2015 IL 118432, ¶ 48.

¶ 75      The State concedes that the five requisite factors for applying judicial estoppel are present in this case. Nonetheless, the State contends that estoppel should not

apply here because this court has held that, when "the discovery of new facts justifies a change in position, and there is no indication of bad faith, judicial estoppel does not apply." *People v. Runge*, 234 Ill. 2d 68, 133 (2009). The State argues that "the inconsistent positions [taken by the State on petitioner's guilt] represented an honest change of position based on new DNA evidence, which was unavailable in the earlier criminal proceeding."

¶ 76    In our view, it is inaccurate to claim that the forensic DNA evidence obtained by petitioner is new evidence for purposes of judicial estoppel. To the contrary, that evidence was collected from under the victim's fingernails and from the bags that covered his hands during the murder investigation and was available at the time of petitioner's criminal trial. Although the State chose not to test that evidence for use at petitioner's trial, that does not render the evidence new for purposes of judicial estoppel.

¶ 77    More critically, the forensic analysis of that evidence excludes petitioner as the principal offender in the victim's murder, directly contradicting the State's original theory of petitioner's guilt. The State cannot now change course in a subsequent proceeding and assert the exact opposite of what it asserted at petitioner's criminal trial. As we have explained, "[j]udicial estoppel applies in a judicial proceeding when litigants take a position, benefit from that position, and then seek to take a contrary position in a later proceeding." *Seymour*, 2015 IL 118432, ¶ 36. That is precisely what occurred in this case, and judicial estoppel forecloses the State's changed position. The lower courts abused their discretion by rejecting petitioner's argument on judicial estoppel.

¶ 78    Because we have determined that petitioner is required to establish his innocence of the offense only as it was charged and prosecuted in his criminal trial under subsection (g)(3), we do not address petitioner's remaining claim that his due process rights were violated by the lower courts' broader construction of subsection (g)(3). It is settled that a court will not address constitutional issues when a case can be decided on another basis. *People v. Austin*, 2019 IL 123910, ¶ 27.

¶ 79                              III. CONCLUSION

¶ 80        For these reasons, we conclude that petitioner is entitled to a certificate of innocence under section 2-702 of Code (735 ILCS 5/2-702 (West 2018)). We reverse the judgments of the circuit court and the appellate court reaching the opposite conclusion, and we remand to the circuit court with directions to enter an order granting his petition for certificate of innocence.

¶ 81        Reversed and remanded with directions.

¶ 82        JUSTICE MICHAEL J. BURKE, specially concurring:

¶ 83        I join the majority's holding that judicial estoppel bars the State from introducing its accountability theory of guilt in petitioner's certificate of innocence proceeding. I also join the majority in reversing the judgments of the circuit court and the appellate court and remanding the cause to the circuit court with directions to issue petitioner a certificate of innocence.

¶ 84        However, I cannot endorse the majority's interpretation of section 2-702(g)(3) of the Code of Civil Procedure (735 ILCS 5/2-702(g)(3) (West 2018)) because it departs from the plain and ordinary meaning of the unambiguous statutory language and incorporates extrinsic matters from petitioner's criminal trial, including the State's initial theory of guilt and the evidence presented to the jury. The majority tailors its interpretation to account for the State pivoting from one theory of guilt to another. But by defining section 2-702(g)(3) in terms of what occurred at petitioner's trial, the majority contravenes our well-settled rules of statutory construction. See *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 56. This unwarranted interpretation is also unnecessary, because judicial estoppel is suited to prevent the State from deliberately changing positions in certificate of innocence proceedings. Respectfully, I specially concur.

¶ 85                              A. Section 2-702(g)(3)

¶ 86        To win a certificate of innocence, a petitioner must prove, by a preponderance of the evidence, the four propositions of section 2-702(g), including that "[(1)] the

petitioner is innocent of the offenses charged in the indictment or information or [(2)] his or her acts or omissions charged in the indictment or information did not constitute a felony or misdemeanor against the State." 735 ILCS 5/2-702(g)(3) (West 2018).

¶ 87 Petitioner argues he proved the first proposition of subsection (g)(3), in that he is innocent of "the offenses charged in the indictment or information." *Id.* Petitioner's conviction of first degree murder is based on count I of the information, which alleged that petitioner "without lawful justification and with the intent to kill or do great bodily harm to [the victim], repeatedly struck [the victim] on the head, thereby causing the death of [the victim]."

¶ 88 Petitioner argues the phrase "the offenses charged in the indictment or information" in subsection (g)(3) means the acts constituting the offense as alleged in the information: in this case, the act of personally striking the victim in the head and, as argued at trial, doing so with a hammer. The State argues it means "first degree murder," regardless of whether petitioner committed the offense as the principal or as an accomplice.

¶ 89 From these two positions, the majority distorts the issue by framing it as whether subsection (g)(3) "require[s] a petitioner seeking a certificate of innocence to prove that he or she was innocent of the offense only as it was originally charged or *innocent of every conceivable theory of criminal liability for that offense*." (Emphasis added.) *Supra* ¶ 1. The State did not raise "every conceivable theory of criminal liability" when it challenged the petition below and does not claim statutory authority to do so in future proceedings. The issue presented is limited to the State's alternative theory of accountability.

¶ 90 By overstating the State's position, the majority displays a reasonable concern about the State grasping at alternative theories of guilt to defeat a certificate of innocence petition, but that concern has clouded what should be a straightforward interpretation of section 2-702(g)(3). This court need not resort to an erroneous reading of the statute to prevent the State from deliberately changing positions to meet the exigencies of the moment, because the doctrine of judicial estoppel is suited to prevent the State from raising "every conceivable theory of guilt" to defeat a certificate of innocence petition.

¶ 91 The majority adopts petitioner's interpretation of the phrase "the offenses charged in the indictment or information" (735 ILCS 5/2-702(g)(3) (West 2018)) as meaning the acts constituting the offenses as alleged in the indictment or information. I respectfully disagree with this statutory construction.

¶ 92 The State correctly concludes that the phrase means the title of the offense, in this case "first degree murder," regardless of whether the defendant committed the offense as a principal or as an accomplice. The State's interpretation is consistent with the plain and ordinary meaning of section 2-702, the principle that accountability is not a separate offense but merely an alternative manner of proving a defendant guilty of the substantive offense, and the goal of avoiding the absurd result of awarding a certificate of innocence to an accomplice who is just as blameworthy as the principal perpetrator of the crime.

¶ 93                           1. "Offenses" and "Acts or Omissions"

¶ 94 Section 2-702(g) must be afforded its plain, ordinary, and popularly understood meaning (*People v. Hammond*, 2011 IL 110044, ¶ 53), and "[i]t is well-settled that when the legislature uses certain language in one instance of a statute and different language in another part, we assume different meanings were intended" (*People v. Goossens*, 2015 IL 118347, ¶ 12). The statute itself differentiates the offense from the means of committing the offense.

¶ 95 A petitioner must prove one of two alternative propositions to satisfy section 2-702(g)(3): "the petitioner is innocent of *the offenses* charged in the indictment or information" or "his or her *acts or omissions* charged in the indictment or information did not constitute a felony or misdemeanor against the State." (Emphases added.) 735 ILCS 5/2-702(g)(3) (West 2018). If the General Assembly had intended "the offenses charged in the indictment or information" to mean the acts constituting the offense as alleged in the charging instrument, the first and second propositions of subsection (g)(3) would contain the same words. One would expect both propositions to refer to the "acts or omissions charged in the indictment or information." Instead, the General Assembly recognized the difference between "offenses" and "acts or omissions" and drafted the two alternative propositions of section 2-702(g)(3) accordingly.

- 22 -

¶ 96    The majority disregards the acts-or-omissions proposition of subsection (g)(3), stripping the term "offenses" of context. Further, the majority does not explain why the General Assembly would use different terms—"offenses" and "acts or omissions"—in the same sentence to describe the same text of the charging instrument. By using certain language in one instance of subsection (g)(3) and different language in another part, we assume different meanings were intended. *Goossens*, 2015 IL 118347, ¶ 12. Petitioner offers no argument to overcome the assumption.

¶ 97    The majority relies on subsection (d), which concerns the contents of a petition. Like subsection (g)(3), it contains the phrase "the offenses charged in the indictment or information." 735 ILCS 5/2-702(d) (West 2018). Petitioner argues that the repetition of the modifying phrase "charged in the indictment or information" in subsections (g)(3) and (d) indicates a legislative intent to require a petitioner to prove his or her innocence only of those acts alleged in the charging document. *Supra* ¶ 60.

¶ 98    In fact, subsection (d) undermines that position, because it mirrors the two propositions of subsection (g)(3). Subsection (d) provides,

> "[t]he petition shall state facts in sufficient detail to permit the court to find that the petitioner is likely to succeed at trial in proving that the petitioner is innocent of *the offenses* charged in the indictment or information or his or her *acts or omissions* charged in the indictment or information did not constitute a felony or misdemeanor against the State of Illinois." (Emphases added.) 735 ILCS 5/2-702(d) (West 2018).

The repetition of the two distinct phrases reinforces my conclusion that the General Assembly did not intend to use "offenses" and "acts or omissions" interchangeably in section 2-702. I respectfully conclude that the General Assembly's deliberate use of different terms in the same sentence indicates that "offenses" does not mean "acts or omissions."

¶ 99                    2. Petitioner's Criminal Trial

¶ 100        Petitioner argues "offenses" means the acts constituting the offense as alleged in the information, but the majority goes a step further, holding "[t]hose allegations, as charged *and prosecuted in petitioner's criminal trial*, are the proper focus of subsection (g)(3)." (Emphasis added.) *Supra* ¶ 72. "We will not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that conflict with the expressed intent of the legislature." *Gaffney*, 2012 IL 110012, ¶ 56. Further, we will not use extrinsic aids of statutory interpretation unless the statutory language is unclear or ambiguous. *Id.*

¶ 101        The majority correctly concludes that the statutory language is unambiguous. Yet the majority emphasizes that "[i]t is undisputed that this [accountability] theory of petitioner's guilt was never charged or presented to the trier of fact in the underlying criminal proceedings" and "the record is devoid of any meaningful evidence or argument to assist a reviewing court in deciding whether first degree murder as an accomplice has been disproven by petitioner in this case." *Supra* ¶¶ 66-67. These points are germane to judicial estoppel and to the ultimate determination of whether petitioner proved his innocence by a preponderance of the evidence (see 735 ILCS 5/2-702(f) (West 2018) (permitting judicial notice of the underlying criminal proceeding)), but not to ascertaining the meaning of "offenses" as that term is used in section 2-702(g)(3). Extrinsic matters such as the State's initial theory of guilt and the evidence presented in the criminal trial have no bearing on the meaning of the statute's unambiguous language.


¶ 102              3. Accountability Is Not a Separate Offense

¶ 103        Furthermore, committing murder by personally beating the victim is not a different offense from doing so by aiding and abetting someone else's act of beating. Illinois courts have long held there is no requirement that a defendant be charged with a crime in the language of accountability. See *e.g.*, *People v. Ruscitti*, 27 Ill. 2d 545, 546-47 (1963) (the conviction did not deny the defendant due process when he was indicted as a principal, while the evidence showed he was an accomplice). An indictment against an accomplice need not "describe the circumstances as they actually occurred," and an indictment is sufficient if the accomplice is charged with "the legal effect of the acts performed by him." *Id.* A

defendant may be charged as a principal even though the evidence proves the defendant was only an accomplice because accountability is not a separate offense but merely an alternative manner of proving a defendant guilty of the substantive offense. *People v. Ceja*, 204 Ill. 2d 332, 361 (2003).

¶ 104    The majority concludes *Ceja* does not support the State's interpretation of section 2-702(g)(3) because (1) *Ceja* was a direct appeal involving jury instructions, while this is a separate action for a certificate of innocence; (2) *Ceja* held a defendant may be charged as a principal and convicted as an accomplice "if supported by the evidence" (*id.*), while no evidence of accountability was presented at petitioner's trial; (3) the State prosecuted Ceja under a theory of accountability, while the State introduced its accountability theory for the first time in the certificate of innocence proceedings; and (4) the State declined to retry petitioner as an accomplice. The distinctions the majority draws between *Ceja* and this case are based on the State changing its position in this certificate of innocence proceeding. These points relate more to judicial estoppel and to whether petitioner sustained his burden of proof than to the plain and ordinary meaning of section 2-702(g)(3).

¶ 105    *Ceja* holds that a defendant may be charged as a principal even though the evidence proves he was an accomplice, but the majority holds that a petitioner satisfies section 2-702(g)(3) by proving his innocence of committing the offense only as it was charged. The majority decision may be read as requiring the State to now charge a defendant as an accomplice to preserve an accountability theory in the event the defendant subsequently initiates proceedings under section 2-702.

¶ 106                                    4. Absurd Results

¶ 107    Finally, it would be absurd and unjust to interpret section 2-702(g)(3) to award a certificate of innocence to someone who, though exonerated of being the principal in a murder, cannot prove by a preponderance of the evidence that he or she was innocent of being an accomplice to the murder. The majority's interpretation entitles a suspected lookout, for example, to compensation (see 705 ILCS 505/8(c), 11(b) (West 2018)) and benefits (see 20 ILCS 1015/2 (West 2018)) to which a certificate of innocence would entitle its holder. Such a result is not "consistent with the legislature's express goal of providing those individuals who are

wrongfully convicted with 'an available avenue to obtain a finding of innocence so that they may obtain relief through a petition in the Court of Claims.' " *Supra* ¶ 64 (quoting 735 ILCS 5/2-702(a) (West 2018)). The General Assembly did not intend to reward an accomplice for obtaining an acquittal as a principal; the law views an accomplice as just as blameworthy as the principal perpetrator of the crime.

¶ 108    I respectfully disagree with the majority's conclusion that the State's interpretation would "defeat the legislative purpose of section 2-702 by effectively imposing a technical legal obstacle on a petitioner seeking relief from a wrongful conviction." *Supra* ¶ 65. The State's interpretation has limited effect, because no obstacle exists where the State does not argue accountability and the evidence often will not support the theory. Moreover, when the State advocates an accountability theory that was not presented at trial, the petitioner may argue the State is judicially estopped from introducing the novel theory.

¶ 109    I conclude the appellate court soundly interpreted section 2-702(g)(3). In a certificate of innocence proceeding where the petitioner claims he is "innocent of the offenses charged in the indictment or information," the State may hold the petitioner to his statutory burden to prove, by a preponderance of the evidence, that he was neither a principal nor an accomplice in the commission of the charged offenses.

¶ 110                              B. Judicial Estoppel

¶ 111    The majority addresses judicial estoppel to provide guidance in future proceedings under section 2-702, but I conclude the analysis is necessary to resolve the appeal. Judicial estoppel is an equitable doctrine invoked by the court at its discretion. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *People v. Runge*, 234 Ill. 2d 68, 132 (2009). It is rooted in the principle that, " '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.' " *New Hampshire*, 532 U.S. at 749 (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). "[T]he uniformly recognized purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from 'deliberately changing positions' according to the

exigencies of the moment." *Seymour v. Collins*, 2015 IL 118432, ¶ 36 (quoting *New Hampshire*, 532 U.S. at 749-50).

¶ 112 Judicial estoppel generally applies when the party to be estopped (1) has taken two positions (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) has succeeded in the first proceeding and received some benefit from it. *People v. Caballero*, 206 Ill. 2d 65, 80 (2002). The existence of the five factors does not always require application of judicial estoppel. *Seymour*, 2015 IL 118432, ¶ 47. A court may consider additional factors, such as the intent to deceive or mislead, inadvertence or mistake in taking the contrary positions, and the significance or impact of the party's action in the first proceeding. *Id.* (citing *New Hampshire*, 532 U.S. at 753). Judicial estoppel, like all estoppels, must be proved by clear and convincing evidence, which accounts for a degree of caution with which the doctrine should be considered and applied. *Id.* ¶ 39. The decision on whether to apply judicial estoppel is reviewed for an abuse of discretion. *Id.* ¶ 48.

¶ 113 The State concedes the existence of the five factors for applying judicial estoppel, stating "one cannot be both an accessory and a principal in the commission of a murder, so the State's respective positions in the criminal trial and in the proceeding for a [certificate of innocence] are factually inconsistent. And the State did prevail at the criminal trial on the first position."

¶ 114 Despite its concession, the State argues judicial estoppel is an "extraordinary" measure that must be "applied with caution to avoid impinging on the truth-seeking function of the court." The State contends its change in position is justified by the discovery of "new facts" where, as here, there is no indication of bad faith. The State concludes "the inconsistent positions represented an honest change of position based on new DNA evidence, which was unavailable in the earlier, criminal proceeding."

¶ 115 In *Runge*, we articulated the reason for relaxing the application of judicial estoppel when a party changes its position based on newly discovered evidence. *Runge* cited *State v. Pendleton*, 706 N.W.2d 500 (Minn. 2005), for the proposition that "the justification for the application of judicial estoppel is at best uncertain where a party changes its position after the previous proceedings due to the

discovery of new evidence, as parties who change their theories after they discover new evidence bearing upon the issue are not acting in bad faith." *Runge*, 234 Ill. 2d at 133 (citing *Pendleton*, 706 N.W.2d at 508). "It seems self-evident that a party's position cannot be deemed 'factually inconsistent' with a former stance if new facts provide an objective justification for a different position." *Id.* Allowing a party to change positions based on the discovery of new evidence is consistent with the court's truth-finding role. *Id.* In such a situation, that party is not playing "fast and loose" with the court, the kind of conduct the doctrine is intended to address. *Id.*

¶ 116    The majority correctly rejects the State's characterization of the DNA evidence as "new evidence." Here, the police collected DNA from under the victim's fingernails and on the bags that covered his hands. The DNA was collected during the murder investigation and was available for testing at the time of petitioner's criminal trial. Petitioner does not allege that the State acted in bad faith, but the State's decision not to test the DNA for use at trial stands in stark contrast with the way the State treated petitioner's shoes.

¶ 117    Jennifer Lu, the State's forensic scientist, testified that she did not test the fingernail scrapings but she examined the shoes twice. The first examination of the shoes disclosed several reddish-brown stains, but they tested negative for blood. The second examination was prompted by the Decatur Police Department, which asked Lu to "tear the shoes apart and examine them for blood." Under a piece of mesh, Lu discovered three stains that tested positive for human blood and matched the victim's DNA. Lu described her first examination of the shoes as "thorough" and explained that the second examination was "not usual procedure."

¶ 118    In contrast to petitioner's shoes, the exculpatory DNA was not tested before trial despite the State's awareness of its existence. The only thing "new" about this evidence was the postconviction testing, which the State opposed. I agree with the majority that, under the unique facts of this case, the DNA testing does not render the evidence "new" for purposes of relaxing judicial estoppel.

¶ 119    Moreover, applying judicial estoppel in this case does not impinge on the truth-seeking function of the court. The postconviction DNA testing excluded petitioner as the principal offender, directly contradicting the State's trial theory. The DNA evidence also failed to support a theory that he is guilty as an accomplice. By contrast, the prosecution's change in position in *Pendleton* was justified by "new

- 28 -

and significant direct evidence [that] came to light identifying [the defendant] as the individual who actually fired the fatal shot that killed [the victim]." *Pendleton*, 706 N.W.2d at 508. Here, the DNA evidence has no bearing on accountability, except to the extent that it excludes petitioner as the principal offender.

¶ 120    I further note that the application of estoppel principles in criminal proceedings is not without precedent. The appellate court has held the State may be judicially estopped in a subsequent proceeding from taking a contrary position regarding chemical testing. In *People v. Wisbrock*, 223 Ill. App. 3d 173, 174 (1991), a motorist arrested for driving under the influence (DUI) attempted to take a breath test, but the test apparatus issued a result reading " '.11 deficient sample.' " The motorist's driving privileges were suspended based on the State's position that his failure to provide a sufficient sample was equivalent to a refusal to submit to the test. The State subsequently attempted to introduce the test result in the criminal prosecution for DUI. *Id.* The *Wisbrock* court held the State was judicially estopped from doing so, reasoning as follows:

> "In the instant case, the State initially took the position that the defendant had refused to take the breathalyzer test. On that basis, the Secretary of State summarily suspended his driver's license. It then took an inconsistent position in the DUI proceeding by attempting to use the result of the test to help convict the defendant. Under these circumstances, we find that the State was judicially estopped from using the breathalyzer result in the DUI trial." *Id.* at 175.

Furthermore, a defendant who claims actual innocence in a successive postconviction petition based on "newly discovered" material must present " 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " *People v. Edwards*, 2012 IL 111711, ¶ 32 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "Newly discovered evidence" in the postconviction context is " 'evidence that was unavailable at trial and could not have been discovered sooner through due diligence.' " *Id.* ¶ 34 (quoting *People v. Harris*, 206 Ill. 2d 293, 301 (2002)). It would be incongruous to impose a due-diligence requirement on postconviction petitioners claiming actual innocence based on new exculpatory evidence, while allowing the State to change positions in this certificate of

innocence proceeding because the State decided not to test the exculpatory DNA before trial.

¶ 121    I agree with the majority that the State's novel accountability theory in the certificate of innocence proceedings was a deliberate change in position to meet the exigencies of the moment; it was not based on an honest change of position based on newly discovered evidence that tended to prove the accountability theory. The State may not benefit from its position at trial that petitioner acted as the principal offender and then take a contrary position in the certificate of innocence proceeding, causing significant prejudice to petitioner. *Seymour*, 2015 IL 118432, ¶ 47. Where the State introduces accountability as a new theory of guilt in certificate of innocence proceedings, a defendant may invoke judicial estoppel, and the circuit court may exercise its discretion in applying the doctrine. Under the circumstances here, the decision not to apply judicial estoppel was an abuse of discretion.

¶ 122    JUSTICES GARMAN and OVERSTREET join in this special concurrence.