THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK T. GENGLER, Defendant-Appellant.

Second District   No. 2—91—0199

Opinion filed September 29, 1993.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, for appellant.

David R. Akemann, State's Attorney, of Geneva (William L. Browers, Marshall M. Stevens, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DOYLE delivered the opinion of the court:

Defendant, Mark Gengler, was found guilty of the unlawful possession of a converted vehicle (Ill. Rev. Stat. 1989, ch. 95½, par. 4—103(a)(1) (now codified, as amended, at 625 ILCS 5/4—103(a)(1) (West 1992))), and the trial court sentenced him to a term of probation. Defendant appeals his conviction and raises two issues for review: (1) whether the jury instructions failed to state correctly the elements of the offense; and (2) whether the trial court improperly responded to the jury's question during its deliberations.

Defendant was charged with attempted murder (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 9—1(a)(1) (now codified, as amended, at 720 ILCS 5/8—4(a), 5/9—1(a)(1) (West 1992))) and robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—1(a) (now 720 ILCS 5/18—1(a) (West 1992))), in addition to possession of a converted vehicle.

At the jury trial, the victim, Lawrence Zengri, testified that on July 21, 1990, he met defendant in front of a tavern in Aurora. Defendant suggested that he get a movie and the two would go to

Zengri's home and have a few beers. Zengri agreed, and defendant picked up a videotape from his apartment. Zengri drove defendant to Zengri's apartment in West Chicago, where they drank alcohol and watched the videotape movie "Deep Throat." After the movie, Zengri drove defendant back to Aurora, sometime in the early morning hours of July 22. Defendant did not want to go home because it was so late and his mother would have asked questions. Defendant requested that Zengri drop him off at a friend's home. Zengri drove defendant to the west side of Aurora, and they drove around for about an hour.

Zengri further testified that defendant then directed him to park by a trail walk on Jericho and Edgelawn Roads. Zengri pulled the car into a parking area, and defendant demanded the keys to the car. When Zengri resisted, defendant punched him in the face, loosening three of Zengri's teeth. Defendant also choked him and threatened to kill him if he did not give defendant the keys. Zengri stated that he drove into a gas station while defendant was choking him. Zengri felt himself blacking out, so he gave defendant the car keys. After Zengri got out of the car, defendant demanded his wallet, and Zengri complied. Defendant began driving the car and hit Zengri in the chest with the car. Defendant drove behind the gas station, came around, and hit Zengri again, striking him in the thigh and knocking him to the ground. Defendant drove off, and Zengri got up and walked to a house to call for help. It was around 5 a.m. Zengri was taken to the hospital by an ambulance, and he was hospitalized for 11 days.

On cross-examination, Zengri first stated that all he and defendant did at Zengri's apartment was watch the movie, but later admitted that he had sex with defendant. Also on cross-examination, Zengri admitted that he had a "billy club" in his car under the seat and he hit defendant with it while defendant was in the driver's seat and Zengri was out of the car. Zengri also admitted that he "accidentally" smashed the rear window of the car with the billy club. Somehow, defendant gained possession of the billy club, but he did not hit Zengri with it. Zengri did not notice anything unusual about defendant's leg or that he walked with a limp. Zengri could not recall if defendant stopped to ask him if he wanted to go to the hospital, nor could Zengri recall if he told a police officer that defendant did so.

Around noon on July 22, 1990, the police found Zengri's car parked in Aurora about a block from defendant's apartment. The car had only a rear license plate, which was registered in defendant's name. In the trunk of the car was a box containing Zengri's VCR, a calculator, and some of his jewelry. The police also recovered the videotape movie "Deep Throat" from defendant's apartment.

Kane County Sheriff's Deputy Mike Anderson testified that when he interviewed Zengri in the hospital Zengri could not recall the name of the movie and remembered it later the following day, after the police had found the videotape. Anderson stated that Zengri told him that after the fight was over defendant offered to take Zengri to the hospital and that Zengri informed Anderson that defendant had taken the billy club from Zengri, but did not use it. Anderson also impeached Zengri's testimony that he was not hit in the grassy area behind the gas station and that defendant had driven behind the gas station. Finally, Anderson related that, although Zengri did not tell one of the other police officers, Zengri told Anderson that he and defendant had sex.

According to the owner of the gas station, there was a pay phone near the gas station, and there were lights by the phone.

Defendant presented the testimony of several witnesses, including his treating physician, which showed that at the time of the incident defendant wore a leg brace which immobilized his right knee. A couple of months before the incident, defendant had been hit by a car, breaking his right leg. The brace went from the mid-thigh to his ankle and held his knee straight, causing defendant to limp. The nurse at the Kane County jail also testified that, in addition to defendant's swollen right knee, defendant also had bite marks on his forearm and finger.

Defendant testified that he was in a bar next to his apartment building drinking tequila and beer when Zengri approached him. Zengri complimented defendant on his tattoos. The two then discussed defendant's leg and how he lost his job because of the injury. Zengri told defendant that he could get defendant a job at the company where Zengri worked. Zengri suggested that defendant accompany him and he would show defendant where the business was so that defendant could apply for work there. Zengri also suggested that they "go party." Defendant agreed.

Upon leaving the bar, defendant went to his apartment to tell his mother he was going out. The two men then stopped at a store and bought beer. Zengri drove to his place of work in St. Charles. They stopped there and talked for 15 minutes, after which they drove for about two hours, "[j]ust cruising around and drinking beer." They ended up on the west side of Aurora at the nature trail.

Zengri parked the car, and they drank and talked. Defendant mentioned that it was getting late and he needed to go home. Zengri asked defendant if he liked "partying." Defendant assumed Zengri meant getting "a buzz," drinking, or smoking marijuana, so defend-

ant said yes. Zengri put his arm around the back of defendant's seat, put his other hand on defendant's crotch, and grabbed defendant by the back of the neck, pulling him toward Zengri. Defendant punched Zengri in the face because he believed that Zengri was going to assault him sexually. Defendant had been molested by a foster parent when he was a teenager.

After defendant punched Zengri, defendant tried to get out of the car, but could not find the door handle. Zengri then hit defendant in the back of the head with a billy club. Defendant got the billy club away from Zengri and threw it in the backseat. Before defendant had a chance to open the car door, Zengri put the car in gear and drove out of the nature trail parking lot. Defendant grabbed the steering wheel in an attempt to turn the car off the road. The car pulled into a gas station parking lot, with defendant and Zengri still fighting for control of the steering wheel. The car's gear shift was on the console, so defendant "slammed it into park." The car slid sideways, while the two fought over the gear shift. The car went back in gear, and they resumed fighting over the steering wheel. Defendant tried to push Zengri to the side, but Zengri bit him.

The car struck the gas station wall, and they flew forward. The driver's door of the car opened, but defendant was not sure whether the impact forced it open or whether Zengri opened it. Defendant pushed Zengri out of the car. Zengri was halfway in and out of the car and trying to get back up, so defendant reached over with his left foot and pressed the accelerator to the floor. Defendant shifted the car into reverse, and the car backed up. At some point Zengri was no longer in the car, and defendant assumed that he had been dragged by the car. Defendant slammed the car back into park, and it stopped. The driver's door swung shut, so defendant reached over to lock the door. Just then Zengri smashed the back window. Zengri was standing on the driver's side of the car, reaching in trying to grab defendant. Defendant put the car back in drive and pulled away. The car ran into something, possibly a post. Defendant drove through a grassy area and ended up in the parking lot of a strip mall next to the gas station.

Defendant saw Zengri sitting on the ground in the middle of the gas station parking lot. He appeared to be hurt. Defendant got out of the car and took a few steps toward Zengri, offering to take him to the hospital. Zengri told defendant to leave. When Zengri started to get up, defendant got back in the car and drove home.

When defendant arrived home, he went inside and drank a couple of beers. He then decided that he ought to notify the police. When he

went back outside the sun was rising, and he was able to see that the car did not have any license plates on it. Defendant had not noticed whether there were plates on the car earlier in the evening. Defendant was afraid he would get pulled over if he drove to the police station without license plates on the car, so he put his own license plate on the back of the car.

Defendant then drove to the Aurora police department. He sat in the parking lot for about an hour, but decided not to go in because he could not bring himself to tell the police what happened to him. Defendant drove the car back to his street and parked it. He took all of his things out of the car and mistakenly took a videotape which was not his.

In rebuttal, Zengri testified that the items found in the box in the trunk of his car were in his apartment when he drove defendant back to Aurora, but were missing from the apartment when Zengri was released from the hospital following the incident. Zengri also stated that the car had license plates on it the night of the incident. Deputy Anderson admitted, on rebuttal, that the police did not dust the box or the items in it for fingerprints.

The jury acquitted defendant of attempted murder and robbery, but found him guilty of possession of a converted vehicle. Following sentencing, defendant timely appealed.

Defendant first contends that his conviction should be reversed because the trial court incorrectly instructed the jury regarding the elements of the charged offense. Specifically, defendant argues that a conviction for the offense of possessing a "converted" motor vehicle requires proof that the motor vehicle in question was taken with an intent to permanently deprive the owner of its use or benefit.

Initially, it is noted that defendant neither objected at trial to the elements instruction given to the jury, nor offered any alternative version proposing to remedy the defect now complained of on appeal. At defendant's request and over the State's objection, the following substantive instruction was given which incorporated the defense of necessity:

> "A person commits the offense of possession of a converted vehicle when that person, not acting out of necessity, possesses a vehicle when not entitled to possession of the vehicle and when knowing it to have been converted.
>
> Property has been converted if a person lawfully entitled to possession of the property has been wrongfully deprived of it.
> * * *

To sustain the charge of possession of a stolen or converted vehicle, the State must prove the following propositions:

First: That the [d]efendant possessed a vehicle; and,

Second: That the [d]efendant was not entitled to possession of the vehicle; and,

Third: That the [d]efendant knew that the vehicle was converted; and,

Fourth: That the [d]efendant did not act out of necessity.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the [d]efendant guilty.

If you find from your consideration of all the evidence that any one of those propositions has not been proved beyond a reasonable doubt, you should find the [d]efendant not guilty."

■■ While failing to object to jury instructions at the time of trial generally waives any claim of error, substantial defects are not waived by a failure to make a timely objection thereto if the interests of justice require. (See 134 Ill. 2d R. 451(c); *People v. Pasch* (1992), 152 Ill. 2d 133, 171.) Instructions on the elements of the offense charged fall within that category of instructions to which the concept of waiver will not be employed to bar reversal if a defendant is convicted in the absence of a necessary instruction. (See *Pasch*, 152 Ill. 2d at 171; *People v. Reddick* (1988), 123 Ill. 2d 184, 198.) Because defendant argues that the instructions given did not properly state the elements of the offense, we will review the issue in spite of his failure to raise the issue during trial.

The instructions given here were modified forms of Illinois Pattern Jury Instructions, Criminal, Nos. 23.14, 23.15, 23.15A (Supp. 1989) (IPI Criminal 2d Nos. 23.14, 23.15, 23.15A (Supp. 1989) (now IPI Criminal 3d Nos. 23.35, 23.36, 23.35A, respectively (1992))). An IPI instruction should be given, rather than a non-IPI instruction, if the IPI instruction accurately states the law. (134 Ill. 2d R. 451(a).) Defendant asserts that the IPI instructions given did not accurately state the law because they did not inform the jury that the conviction "requires proof that defendant intended to permanently convert the car and deprive the owner of its use." Defendant relies on *People v. Sergey* (1985), 137 Ill. App. 3d 971, in support of his contention.

In *Sergey*, the defendant was convicted of possessing a converted motor vehicle. The defendant claimed he took a car which he mistakenly believed was owned by his employer. The keys had been left in the vehicle's ignition. He did not first obtain permission of the employer to borrow a car, but the evidence was undisputed that defend-

ant's employer would have granted him permission to use a vehicle. The defendant went to a tavern for 20 minutes, and as he was heading back to return the car, he was arrested for driving under the influence of alcohol. In considering whether the defendant possessed a converted vehicle, the court determined the meaning of the term "converted" as used in section 4—103(a)(1) of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/4—103(a)(1) (West 1992)). The court stated:

> "Illinois case law generally defines civil conversion of a chattel as an unauthorized and wrongful assumption of the right to possession or ownership in the property which deprives the owner of his rights as owner. [Citations.] The measure of damages for conversion is the full value of the chattel, so the tort of conversion is usually confined to those major interferences with a chattel or the owner's rights therein which are so egregious as to merit what is, in essence, a forced judicial sale of the property. [Citations.] Both the Restatement and Prosser and Keeton's text agree that a brief unauthorized use of a car left undamaged by the defendant, such as his driving it only 10 miles, as opposed to a trip of hundreds of miles, should not be held to be a conversion." *Sergey*, 137 Ill. App. 3d at 975.

After reviewing the use of the term "conversion" in the civil context, the court concluded that no conversion had occurred because "there was not proof of damage to the car and the owner did recover it. Also, defendant had no intent to permanently deprive the owner, and it is unrefuted that the defendant's employer, whom defendant believed was the owner, would have given him permission to use the vehicle had he owned it. And *** defendant here only temporarily used the property without causing any harm to it." (*Sergey*, 137 Ill. App. 3d at 975-76.) Subsequent to our decision in *Sergey*, IPI Criminal 2d was supplemented to include an instruction defining the term "converted" as it is used in section 4—103(a). See IPI Criminal 2d No. 23.15A (Supp. 1989) ("Property has been 'converted' if a person lawfully entitled to possession of that property has been wrongfully deprived of it"). (Emphasis added.)

In *People v. Washington* (1989), 184 Ill. App. 3d 703, we were asked to consider an instruction defining the phrase "converted property" to mean "property over which unauthorized control has been obtained by the act of actually appropriating the property of another to his own beneficial use and enjoyment." (*Washington*, 184 Ill. App. 3d at 709.) The defendant complained on appeal that, in the context of section 4—103(a)(1), conversion requires an intent to permanently deprive the owner of his property and a failure to so instruct requires

reversal. We rejected this argument, specifically noting that *"Sergey* is not authority that a jury must be instructed as to intent to permanently deprive." (*Washington,* 184 Ill. App. 3d at 709.) We approved the use of the above IPI Criminal 2d No. 23.15A (Supp. 1989) for defining the term "conversion," as well as the non-IPI instruction which the trial court had given instead. *Washington,* 184 Ill. App. 3d at 709.

*Washington* held that intent to permanently deprive is not an element of the offense of possessing a stolen or converted motor vehicle. (*Washington,* 184 Ill. App. 3d at 708.) We recognized, however, that a conviction under section 4—103(a)(1) may be predicated upon possession by the same individual who allegedly committed a previous theft of the motor vehicle, and, in such a case, proof of a defendant's mental state inconsistent with that required for theft would prevent a conviction of possession of a stolen motor vehicle. See *Washington,* 184 Ill. App. 3d at 708.

Two other decisions of this court have also recently dealt with this issue. In *People v. Pozdoll* (1992), 230 Ill. App. 3d 887, and *People v. Cozart* (1992), 235 Ill. App. 3d 1076, we reexamined the holding in *Washington* and *Sergey.* In *Pozdoll,* we noted that "[t]he court [in *Sergey*] reversed defendant's conviction on the conversion claim because defendant *justifiably* thought he was borrowing his employer's car, defendant had no intent to criminally deprive the owner, and it was unrefuted that defendant's employer would have granted permission to use the vehicle." (Emphasis added.) (*Pozdoll,* 230 Ill. App. 3d at 889.) *Sergey*'s case required reversal because the defendant lacked knowledge that the vehicle he possessed was converted and, accordingly, lacked *mens rea.* We have specifically rejected the assertion that conversion cannot be found where there is only a temporary use of property without causing harm to it. *Pozdoll,* 230 Ill. App. 3d at 890.

In *Cozart,* the defendant was charged with possession of a *stolen,* rather than a converted, motor vehicle. The evidence revealed that the defendant himself had taken the car originally, but the circumstances under which the car was taken were disputed. Relying on *Washington,* we again held "that intent to permanently deprive is not an element of the offense of possession of a stolen motor vehicle, and defendant's mental state in that regard was irrelevant." (*Cozart,* 235 Ill. App. 3d at 1082.) In those cases, however, where the defendant charged with possession of a stolen motor vehicle is also the person who allegedly committed the underlying theft, proof that the defendant's mental state was inconsistent with that required for theft would prevent a conviction under section 4—103(a). (*Cozart,* 235 Ill. App. 3d at 1082.) This conclusion flows from a plain reading of the section's

language. A person may be charged with the possession of a stolen motor vehicle even if he is the one who has stolen it, but in such a case the defendant would have to *know* he had stolen it. (*Cozart*, 235 Ill. App. 3d at 1080, citing *People v. Cramer* (1981), 85 Ill. 2d 92, 100.) *Cozart* recognized that, in such a case, a defendant's proposed instruction defining the elements of theft, including the requisite intent to permanently deprive, was tantamount to a requested instruction on the defendant's theory of the case. (See *Cozart*, 235 Ill. App. 3d at 1082-83.) A party is entitled to have the jury instructed on his theory of the case, and it is an abuse of discretion for the court to refuse to instruct the jury on the defendant's theory of the case if it has some foundation in the evidence. *Cozart*, 235 Ill. App. 3d at 1083; *People v. Swartz* (1989), 186 Ill. App. 3d 399, 401.

■ We hold that the principles delineated in *Cozart* and its predecessors are also applicable in those cases in which a defendant who is charged with possessing a converted motor vehicle is also the individual accused of committing the initial "conversion." The act of conversion, as it is understood in the context of section 4—103(a), has been adequately defined by IPI Criminal 2d No. 23.15A (Supp. 1989) and the line of cases discussed above as requiring a wrongful deprivation of the vehicle. It is possible, as was arguably the case in *Sergey*, for an individual to "convert" a motor vehicle, for purposes of civil liability, without knowledge of the fact that he or she had done so; however, because the crime of possession of a converted motor vehicle requires the accused be proven to have known that the vehicle was converted, a defendant in the foregoing *Sergey* illustration would not be guilty of violating section 4—103(a)(1) because that individual lacked knowledge that the person lawfully entitled to possession of the motor vehicle had been wrongfully deprived of it.

■ The facts of the present case, however, do not resemble the facts presented in *Sergey*. Here, defendant admitted taking the victim's car without consent, but claimed that the taking was justified under a "necessity" theory. (See Ill. Rev. Stat. 1989, ch. 38, par. 7—13 (now 720 ILCS 5/7—13 (West 1992)).) For the defense of necessity to be applicable, defendant must admit he committed the offense since necessity merely justifies an otherwise criminal act. (*People v. Pickett* (1991), 217 Ill. App. 3d 426, 428.) In view of defendant's admitted version of the incident, there was no possibility that the jury might reject his necessity defense and at the same time find that he did not intend a wrongful conversion. Defendant's testimony established that his actions in taking the vehicle were intentional and would necessarily have constituted a wrongful taking, absent circumstances justify-

ing his actions as necessary. The necessity theory of defense was presented to the jury through instructions submitted by defendant, and the jury rejected it based upon the evidence. We conclude that the trial court correctly instructed the jury on this question.

■ The second issue raised by defendant is whether the trial court's actions in responding to a jury inquiry coerced a verdict. During deliberations, the jury sent a written question to the trial court asking whether it could return a verdict on two of the three charged counts. Relying on *Jenkins v. United States* (1965), 380 U.S. 445, 13 L. Ed. 2d 957, 85 S. Ct. 1059, defendant argues that the trial court erred in responding that the jury was required to return verdicts on all three counts. Defendant's case, however, must be distinguished from *Jenkins*, where the jury had advised the trial court that it was unable to agree on a verdict "because of insufficient evidence," and the trial court had responded that the jury had to reach a decision. (*Jenkins*, 380 U.S. at 446, 13 L. Ed. 2d at 958, 85 S. Ct. at 1060.) The United States Supreme Court, *per curiam*, held, under these circumstances, that the trial court had coerced guilty verdicts. *Jenkins*, 380 U.S. at 446, 13 L. Ed. 2d at 958, 85 S. Ct. at 1060.

In defendant's case the jury's note gave no indication that the jury was deadlocked. When the jury is not deadlocked, it is not coercive to inform the jury that it must return verdicts on all counts. (*People v. Rollins* (1982), 108 Ill. App. 3d 480, 486.) Also, it is only through speculation that defendant concludes that the count at issue in the jury's question was the possession of a converted motor vehicle charge. Such speculation is insufficient to demonstrate any actual prejudice to defendant. (See *People v. Reid* (1990), 136 Ill. 2d 27, 40-42.) We conclude that the trial court committed no error in its response to the jury's inquiry.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

UNVERZAGT and McLAREN, JJ., concur.