2021 IL App (2d) 180841-U
No. 2-18-0841
Order filed May 11, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Stephenson County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-6 |
| SHANE D. RILEY, | ) ) ) | Honorable Michael Paul Bald, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in: (1) refusing to tender to the jury an instruction for criminal trespass to vehicle as a lesser-included offense of possession of a stolen motor vehicle, where the necessity affirmative defense required defendant to admit the elements of the greater offense, thereby, precluding the inconsistent and statutorily proscribed option of the uncharged lesser-included offense; and (2) admitting, in a trial where defendant's credibility was at issue, his recent prior Wisconsin conviction.  Affirmed.

¶ 2    After a jury trial, defendant, Shane D. Riley, was convicted of residential burglary (720 ILCS 5/19-3 (West 2016)), theft (720 ILCS 5/16-1(a)(1)(A) (West 2016)), and possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2016)).  The trial court denied his motion for

a new trial and entered judgment on the convictions for residential burglary and unlawful possession of a stolen motor vehicle. Defendant was sentenced to concurrent terms of five years' imprisonment for residential burglary and three years' imprisonment for possession of a stolen motor vehicle. Defendant appeals, arguing that the trial court erred in: (1) refusing to tender to the jury an instruction for criminal trespass to vehicle as a lesser included offense of possession of a stolen motor vehicle; and (2) admitting his prior Wisconsin conviction for substantial battery/intended bodily harm. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                         A. Trial

¶ 5      Trial commenced on August 20, 2018. The State's theory of the case was that, in December 2017, defendant lived with his friend, Shannon Nafzger, at the Saxbys' house on Damascus Road in Stephenson County. However, on Friday, December 29, 2017, defendant was at his mother's, Arlis Riley's, home on Carver Street in Winslow. It was cold that evening. During that night, defendant drove away in Nafzger's Nissan Xterra, and the vehicle got stuck by the Pecatonica River near Keith Kleckler's house at 5771 West Empire Road in McConnell. Defendant exited the vehicle, walked to a trailer on Kleckler's property, and broke a glass panel in a door to gain entry. The trailer had electricity and three bedrooms. Defendant walked around the home and then left.

¶ 6      Defendant walked to 5861 West Empire Road, Jesse Becke's unoccupied home. Although it did not contain furniture, the State's theory was that the home had electricity and heat and that defendant broke a glass panel in a door to enter the home. However, he did not stay. Instead, defendant, according to the State, walked around the property, as reflected in footprints in the snow, and tried to enter an unattached garage.

¶ 7     Next, defendant walked to 8502 North Korth Road, the home of Jeffrey and Brenda Sauberlich. The couple had gone to bed around 1:30 a.m. At about 2 a.m., they heard noise on the main floor below them and assumed it was one of their cats knocking over something. They did not go downstairs to investigate. Defendant entered the home, and he smoked a cigarette, as evidenced by the presence of his deoxyribonucleic acid (DNA) on the cigarette butt and the fact that the Sauberlichs are not smokers. According to the State, defendant broke a kitchen window to exit the home. He also stole the couples' 1991 Honda Accord, drove to the Winslow gas station, left the car there, and returned to his mother's house. He then returned to the gas station, tried to start the Accord, but it would not start.

¶ 8     The next day, defendant did not return to the homes he visited the prior evening. Instead, he first drove around with Rhonda Saxby and Nafzger for a couple of hours, looking for the Xterra. Afterward, Nafzger, David Voegeli (Nafzgers's uncle), and defendant drove around, looking for the Xterra. At one point, after returning to the Accord and retrieving a registration paper with an address on it, they drove through the neighborhood of the homes defendant had visited, and defendant, seated in the back seat, instructed Voegeli, who was the driver, to not stop at these homes. The following day, defendant went to work, and, one or two days later, he returned to the Accord to try to start it with jumper cables, but it would not start.

¶ 9     Defense counsel took the position that the State's theory of the case was true, including that defendant broke the glass panel in the door to Kleckler's trailer, the glass panel in the door at Becke's unoccupied residence, and the kitchen window at Sauberlichs' home to gain entry or leave. However, defendant raised the affirmative defense of necessity, arguing that it was below freezing, about 10 to 15 degrees below zero, that evening and the residences broken into were in a rural area and there were no other homes in the area. The defense also claimed that defendant took no

valuables from the trailer, although they were available, and asserted, contrary to what the State asserted the evidence would show, that there was no heat in the trailer. Defense counsel also argued that the evidence would show that defendant left the Accord at a gas station in Winslow.

¶ 10                                 1. Jeffrey Sauberlich

¶ 11     Jeffrey Sauberlich testified that he and his wife, Brenda, lived at 8502 North Korth Road in McConnell. The area is very rural. His closest neighbors live 12 or 15 acres down the road. The couple's bedroom is on the second floor. On the evening of December 29, 2017, Jeffrey, who delivers pizzas, arrived home from work at 1:30 a.m. and parked his Honda Accord next to the garage door. He was unable to lock the front door that evening due to the cold temperatures. Jeffrey went to bed about 10 to 15 minutes after he arrived home. Later, he heard a loud crashing noise. Jeffrey assumed one of his cats knocked over a glass or other object. He went back to sleep.

¶ 12     The next morning, Jeffrey went downstairs, opened the door, and felt a blast of cold air. He looked to the left and saw that his kitchen window was broken. He also saw a hammer on the counter, which was not there when he went to bed. The hammer is ordinarily in his wife's pickup truck. Jeffrey walked to the front door (which is a glass door on the back porch), intending to go outside to get some wood to throw into the wood stove, but noticed the door handle on the floor. The other part of the handle was on the ground outside. The door had a double-sided deadbolt lock; thus, one needed a key to get in or out. Without a key, one would have to break a window to enter the house. Jeffrey noticed footprints in the snow that looked like someone had climbed out of the kitchen window. The bottom of the window is about 4½ feet above the ground.

¶ 13     Jeffrey went outside and noticed that his Accord was missing. He and his wife searched the house and noticed that Brenda's clip hanger that she used to clip her keys onto her purse, $5.00 from her purse, and a bottle of prescription medication were gone. They also found a cigarette in

a pie pan they used from the night before. Neither Jeffrey nor Brenda smokes cigarettes. The couple also looked through Brenda's Dodge Ram truck and noticed that the visor was down, papers normally stored there were on the seat, and the glove box was open.

¶ 14    The Saxbys' house is a 10- to 12-minute walk from the Sauberlichs' house. Jeffrey did not know defendant or give him permission to take the Accord.

¶ 15                                  2. Brenda Sauberlich

¶ 16    Brenda testified that she did not give defendant permission to enter her home or use her car; nor does she know him. Neither she nor Jeffrey smoke cigarettes. Brenda is the primary driver of the Dodge Ram truck and was likely the last person to drive it before the police arrived. She did not leave the visor down or the glove compartment open. The Saxbys' residence is about a 15-minute walk from her home.

¶ 17                                  3. Arlis Riley

¶ 18    Arlis Riley, defendant's mother, testified on the State's behalf that, on the evening of December 29, 2017, defendant was staying at her house at 209 Carver Street in Winslow.

¶ 19                                  4. Amanda Ruthven

¶ 20    Amanda Ruthven testified that she had known defendant for 20 years. She saw him on December 30, 2017, at her job at Boco's store, which is across the street from Arlis Riley's house. Ruthven did not see defendant with a car, but did see the car after she left her job. She identified a photograph of the Accord as the car she saw.

¶ 21                                  5. David Voegeli

¶ 22    David Voegeli testified that he works as a driver for an Amish community and knows defendant. Defendant had resided with Voegeli's niece, Shannon Nafzger. In the afternoon of December 30, 2017, Nafzger contacted Voegeli. She was upset because defendant had taken her

car, a Nissan Xterra, and did not know where he had left it. Nafzger sought help to find her car. Voegeli drove Nafzger and defendant in his truck for about five hours all over the county, looking for Nafzger's vehicle. Defendant was seated in the back seat, and Nafzger was in the front seat.

¶ 23 As darkness was setting in, defendant decided that he wanted to get a letter out of a certain parked car in a gas station parking lot in Winslow. The vehicle was a Honda Accord. Defendant did not explain to whom the car belonged. Voegeli pulled up to the car and stopped. Defendant got out and walked to the car. He opened the door and reached inside to get an envelope. According to Voegeli, defendant mumbled something to Nafzger about trying to get an address for the Xterra.

¶ 24 Voegeli punched into the GPS the address defendant obtained, and they drove to McConnell to look for Nafzger's car. They drove down a dirt-and-gravel road (a field road) that was not a good road on which to drive. It was not the road that was punched into the GPS, but defendant started recognizing the area and "that's how we went down that road." It was getting dark. They did not locate the vehicle, but continued to search. They came upon a house that Nafzger wanted to approach, but defendant stated he did not want to go to the house. Nafzger got out of the car and went to the house, and defendant exited the car and became upset. He did not go to the house.

¶ 25 A truck approached and pulled up next to Voegeli's vehicle. Voegeli and Nafzger asked the driver, a man, about the Xterra. Voegeli's understanding was that the man lived at the house where they had stopped. They eventually drove away. Defendant stated that the man could try to kill him. Defendant did not speak to the man in the truck and did not want to go up to his house. Afterwards, they drove back to Winslow. Voegeli dropped off defendant at his house. They never found the Xterra.

¶ 26   Defendant talked about how he broke into houses and took a car, but, Voegeli did not pay much attention to this statement.

¶ 27                                    6. Christopher Prest

¶ 28   Christopher Prest, a corrections officer with the sheriff's department, testified that he took defendant's fingerprints and identified them on his arrest card.

¶ 29                                    7. Keith Kleckler

¶ 30   Keith Kleckler testified that he was a retired construction worker who lived at 5771 West Empire Road in McConnell.  On the evening of December 29, 2017, it was very cold.  He would not have driven his vehicle in that weather.  It was also a night on which he would not want to walk around because of the bitter cold.  He described the area in which he lived as very rural.

¶ 31   At about 11:15 p.m., Kleckler was going to bed and noticed what he thought was a car driving toward the river by his home.  He did not see the car, but believed it was a car because he could hear the noise and see the light on his ceiling.  The driveway is an unpaved road like a cow path, and it leads down to the Pecatonica River.  There is a sign on Empire Road, stating that it is a dead end.

¶ 32   The next morning, on December 30, 2017, at about 9 or 10 a.m., Kleckler found a Nissan Xterra in the pasture by the river on the cow path, about a five-minute walk from his house.  He observed footprints in the snow going about 30 yards from the vehicle to a trailer near the river that belonged to him.  After that, the footprints went to his neighbor's, Becke's, property, about a 10-minute walk away.

¶ 33   A sheriff's deputy notified Kleckler that his trailer had been damaged and broken into.  The trailer did not have heat, but it had electricity.

¶ 34    Two days later, at about 4 or 5 p.m. when it was starting to get dark, Kleckler was driving his truck in the driveway by Becke's property, also on Empire Road, and had a conversation with people in a truck pulled alongside him. The people told him that they were looking for an Xterra vehicle. Kleckler had difficulty seeing inside the truck, but did see a man in the driver's seat, a woman in the front passenger seat, and somebody in the back seat. After Kleckler told the driver about all of the windows being broken out, the man became angry, turned around, and said something to somebody in the back seat. "He [*i.e.*, the driver] said you did all of that?" Kleckler told the people in the other truck that the Xterra was in the sheriff's department's custody, and they drove away.

¶ 35                              8. Deputy Jonah Piper

¶ 36    Sheriff's deputy Jonah Piper testified that, on December 30, 2017, at 8:30 a.m., he responded to a call to go to the Sauberlichs' residence concerning a stolen motor vehicle. The temperature was below zero on the evening of December 29, 2017, and the night before, and it had snowed midday and into the evening on December 29, 2017. The Sauberlichs informed Piper and his partner, sergeant Croffoot, that somebody had broken into their home (and broken a window) and stolen one of their vehicles. Also, a hammer had been removed from their truck. Deputy Piper and Croffoot investigated the scene and saw footprints in the snow leading from the middle of the driveway to a truck in the backyard. The footprints then led from the back of the house to a basement access door, and to the front glass door area. The Sauberlichs informed the deputy that somebody entered through the front door. Piper did not enter the residence but contacted the Illinois State Police crime scene investigation team. Afterward, Piper and Croffoot searched the area for the stolen car, but were unable to locate it.

¶ 37    Kleckler contacted the crime scene investigator about an abandoned car on his property. Piper and Croffoot went to Kleckler's property and found the abandoned car, an Xterra, some distance (about 40 to 50 feet from the house) to the right of the driveway (between the pole barn and the house) and close to the river. The vehicle was not locked, and they entered. The keys were in the ignition, the car was in drive, and it was not running.

¶ 38    Footsteps led from the vehicle to a trailer. Piper and Croffoot entered the trailer. The glass panel was broken, and the door was ajar. There were snow tracks inside. Some led to the back of the unit, where it appeared that someone had removed an access panel on the furnace and tried to turn on the heat. There was electricity in the trailer. The officers did not learn of anything being taken from the trailer.

¶ 39    Outside, footprints led toward a road and eventually to another property. The distance from Kleckler's trailer to the other property was about a 10- to 15-minute walk. The officers next visited Becke's property. The property was vacant. The footprints led them to the front door of this property. The door was unlocked and the "decorated" window was heavily damaged, thus, allowing someone to access and open the door from the inside. Once inside, the officers noticed that it was warm and that the house had electricity. No one was living there, and there was a for-sale sign in the front yard. The snow tracks led from the home to a smaller building and then to the pole barn. It appeared that someone had tried to pry open the sliding glass door to the barn. The snow tracks led to the Sauberlich's house, where they had begun their investigation.

¶ 40    The following day, Piper and Croffoot were on patrol, looking for the stolen vehicle and found it behind a gas station in Winslow (the only gas station in that town, also called Boco). It was a Honda Accord that belonged to the Sauberlichs. Inside the car, police subsequently found

a pill bottle, jumper cables, and other items in the messy interior. The officers did not enter the vehicle. Piper was unsure if there were keys in the ignition. The car doors were locked.

¶ 41                    9. Crime Scene Investigators and Stipulations

¶ 42    Jeffrey Thew and Steve Olson, crime scene investigators with the Illinois State Police, testified that, on December 30, 2017, at the Sauberlichs' residence, they collected a cigarette for DNA analysis and lifted a fingerprint from the Xterra.

¶ 43    The parties stipulated that the partially smoked cigarette found at the Sauberlichs' residence substantially matched to defendant's DNA sample and that the fingerprint lifted from the Xterra belonged to defendant.

¶ 44                    10. Rhonda Saxby

¶ 45    Rhonda Saxby has two homes on her property on Damascus Road. She and her husband live in one of the homes, and defendant and Nafzger had lived together in the other one for about four months. In the morning of December 30, 2017, Saxby received a call from Nafzger, asking for help to locate her car that defendant had driven and lost. Saxby picked up Nafzger and defendant in her car and drove around for an hour or two, looking for the car. Nafzger then called her uncle, David Voegeli, for help. While Saxby was driving defendant and Nafzger, defendant told her that the car was lost in a field, far back on McConnell Road. He also stated that he walked to a home in Winslow. Saxby did not believe defendant, because it is a very long walk and it was very cold. Defendant also stated that he had run out of gas.

¶ 46                    11. Defendant's Case in Chief - Defendant

¶ 47    During his case in chief, defendant testified that, on December 29, 2017, he was at his mother's house and left in Nafzger's Nissan Xterra to go to the other residence where he was

staying—the Saxbys' house. His purpose was to retrieve his work badge that he had left there the previous night, because he had to work the next day. On the way there, defendant got lost.

¶ 48    He explained that he started driving on a road with steep hills he did not recognize, knowing he was going the wrong way. He turned on Korth Road, onto a farmer's road (or cow path) (near Kleckler's residence on Empire Road) and wanted to turn around, but the path was so narrow that he could not and, thus, kept driving. Defendant did not know why he did not execute a three-point turn; he also testified that he had pulled in too far to do a three-point turn. He passed a shed and then reached a trailer on Kleckler's property, where he saw a roundabout with a tree in the middle. He tried to turn around, but the Xterra got stuck. The Xterra's engine died when defendant tried to get out.

¶ 49    Defendant walked up to the trailer to ascertain if anyone was inside. After no one responded, he returned to the Xterra trying to figure out what to do. It was very cold outside, and he thought he might die. Then, his "survival instinct kicked in" as he thought about his daughter, and he decided to break the window to the trailer and go inside in the hope that there was heat. However, once inside, he realized there was no heat, and it was "freezing." Defendant tried to get the furnace started, but was not successful. He considered wrapping himself in a blanket, but decided to try to find someone living nearby. Also, he did not want to stay in the trailer and have someone show up with a gun. He went outside and unsuccessfully tried to start the Xterra.

¶ 50    Defendant decided to look for help at Becke's house. However, he discovered that no one was living there. He could not open the garage door, but saw a gas tank on the side of the house, which indicated to him that there was heat inside the house. Defendant discovered a big shed next to the house and tried to open the sliding door, but it jammed. He then went back to the house and tried to break off a small square piece of glass in a panel in the door so that he could reach in and

unlock the door, but the entire glass panel broke off. He entered the house, and it was warm. Defendant turned up the heat. He also looked for a telephone, but did not find one. Defendant started to feel lightheaded and became scared of a potential gas leak. He left the house.

¶ 51     Defendant saw a truck about one half mile down the road and decided that, if there were keys inside it, he could use the truck to get back home. The house near the truck was the Sauberlichs' residence. Once at the truck, defendant could not find keys inside. He went to the back of the house. He knocked on the door, and perhaps a cat knocked over something. Defendant went to the green basement door, but it was locked. Next, he went to the porch and looked through the sliding door. It appeared that the area was used for storage, and he thought that no one lived there. The door was unlocked, and he entered. There was heat inside. He looked for a telephone. Defendant found a laptop, but it would not work.

¶ 52     Defendant sat in a chair and smoked a cigarette to calm himself down, because he was having "severe anxiety." He put out the cigarette in a pie pan and decided to sit and wait for someone to show up. Defendant fell sleep and woke up went it was daylight out. He tried to leave the residence, but the door handles to the sliding door had fallen off and he could not get out. He tried the back door, but he could not exit. Defendant then heard footsteps upstairs and feared he would be killed. He "freaked out," broke the kitchen window with a hammer, and took a Honda Accord that was parked outside the home (and in which he found keys) and drove it to Winslow. "I don't know how I found my way back, but I did." He parked the car at the gas station.

¶ 53     Defendant further testified that he spent about eight hours at the house. He did not know there was a second floor. Defendant walked around but did not see stairs. He also testified that he said "hello" when he entered the house.

¶ 54    Defendant went to his mother's house and told her and Nafzger what happened, but they did not believe him at first.  Nafzger told him they should take back the Accord to its owners, so they went to the gas station and got into the car.  When defendant tried to start the Accord, it would not start.  He thought, "Great.  Just my luck.  I can't take it back to the people now."  Nafzger became angry that defendant lost the Xterra.  Nafzger called Voegeli, and he drove Nafzger and defendant to look for the Xterra.  Before they left, they went to the Accord, and defendant found inside it a piece of paper with an address that defendant used to try to locate the Xterra.  They searched for the Xterra, but could not locate it.  They ended up stopping near Klecklers' residence, but defendant did not tell Kleckler what happened, because he did not think Kleckler would believe him.

¶ 55    They obtained the Accord owners' address from registration documents in the car, but they did not stop at the Sauberlichs' house, because, according to defendant, Voegeli would not listen to him after they spoke to Kleckler.

¶ 56    After they entered in the GPS the address of the Accord's owners, they drove down the road near Becke's house but did not go to the residence.  Voegeli would not listen to defendant when he asked him to stop the truck.  Voegeli, according to defendant, felt that he had driven long enough.  They had spent about 15 minutes driving around after entering the address on the GPS device.  Before encountering Kleckler, they drove by the trailer, but the Xterra was gone.

¶ 57    Afterward, Voegeli drove defendant to his mother's house.  The next day, Voegeli picked up defendant and drove to work.  One or two days later, defendant "asked for" jumper cables to try to start the Accord, but it did not start.  Jumper cables were subsequently found in the Accord.  Defendant testified that he intended to return the vehicle.

¶ 58 When asked why he did not tell anyone afterward what had happened, defendant responded that he felt that no one would believe him. After the incident, he did not return to the Sauberlichs' house to tell them he took their vehicle. He testified, "I could have done that. Should have done that." Instead, he went to work. He conceded that he did not need the Accord in his possession in order to tell the Sauberlichs that he took their vehicle.

¶ 59 Defendant explained that he got lost. He had been living in the area for three months, but had not driven in that direction because he worked in Duluth, which is in the opposite direction.

¶ 60                          B. Verdict and Subsequent Proceedings

¶ 61 The jury found defendant guilty of residential burglary, possession of a stolen motor vehicle, and theft. Defendant moved for a new trial, and the trial court denied the motion. The court entered judgment on the residential-burglary and unlawful-possession-of-a-stolen-motor-vehicle convictions, and it sentenced defendant to five years' and three years' imprisonment, respectively, to run concurrently. Defendant moved to reconsider the sentence, and the trial court denied the motion. Defendant appeals.

¶ 62                                II. ANALYSIS

¶ 63 Defendant argues that the trial court erred in: (1) refusing the lesser-included-offense instruction for criminal trespass to vehicle as an option other than the greater offense of possession of a stolen motor vehicle; and (2) admitting defendant's prior conviction. For the following reasons, we reject defendant's arguments.

¶ 64                          A. Lesser-Included-Offense Instruction

¶ 65 Defendant contends the trial court erred in refusing to tender to the jury an instruction for criminal trespass to vehicle as a lesser-included offense of possession of a stolen motor vehicle. The first part of defendant's argument is that the lesser-included instruction should have been

given as a third option other than an acquittal or guilty verdict on possession of a stolen motor vehicle. The second part of defendant's argument is that the necessity affirmative defense is not a bar to the lesser-included-offense instruction. For the following reasons, we reject the second part of defendant's argument and, because it is dispositive of the issue, we need not reach the first part of his argument.

¶ 66    During trial, the State moved to exclude the use of the necessity defense, arguing that the affirmative defense and defendant's requested lesser-included instruction on criminal trespass to vehicle were inconsistent. Specifically, the State asserted that it was not consistent for defendant to admit to the commission of a stolen motor vehicle and claim it was justified due to necessity, while at the same time asking the jury that, if they did not believe his necessity defense, to consider the lesser offense of criminal trespass to vehicle. If the jury believed that he was acting under necessity, the elements of criminal trespass to vehicle were not met. Alternatively, if the jury found defendant was not acting under necessity, then it would find him guilty of unlawful possession of a stolen motor vehicle—the offense to which he admitted by raising the necessity defense. By introducing the lesser-included instruction, the State argued, defendant was denying he committed unlawful possession, and the trial court could deny a defendant's use of the necessity defense. At the hearing, the State also asked the court to deny the proffer of the lesser-included instruction.

¶ 67    Defendant responded that he was entitled to present alternative theories and noted that criminal trespass does not require an intent to permanently deprive, as does possession of a stolen motor vehicle. The trial court agreed with the State and declined to give to the jury the lesser-included instruction. Defendant again raised the issue in his posttrial motion, and the court rejected the argument.

¶ 68    "A person commits criminal trespass to vehicles when he or she knowingly and without authority enters any part of or operates any vehicle[.]" 720 ILCS 21-2(a) (West 2016).  A person commits unlawful possession of a stolen motor vehicle when he or she possesses it "knowing it to have been stolen[.]"  625 ILCS 5/4-103(a)(1) (West 2016).  "Knowledge that a vehicle *** is stolen *** may be inferred: (A) from the surrounding facts and circumstances, which would lead a reasonable person to believe that the vehicle *** is stolen ***; or (B) if the person exercises exclusive unexplained possession over the stolen *** vehicle ***, regardless of whether the date on which the vehicle *** was stolen is recent or remote[.]" *Id.*  Here, the parties agree that criminal trespass to vehicle is a lesser-included offense of possession of a stolen motor vehicle.  See *People v. Owens*, 205 Ill. App. 3d 43, 45 (1990), *rev'd on other grounds by People v. Thomas*, 171 Ill.2d 207 (1996).

¶ 69    Construction of a statute is a question of law that we review *de novo*.  *People v. Johnson*, 2019 IL 123318, ¶ 14.  "The fundamental goal of statutory construction is to ascertain and give effect to the legislature's intent, best indicated by the plain and ordinary meaning of the statutory language." *People v. Palmer*, 2021 IL 125621, ¶ 53.  "It is presumed that the legislature did not intend absurd, inconvenient, or unjust results." *Id.*

¶ 70    Defendant raised the necessity affirmative defense in response to the charges of residential burglary, theft, and unlawful possession of a stolen motor vehicle.  The Criminal Code of 2012 defines necessity as: "Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his [or her] own conduct."  720 ILCS 5/7-13 (West 2016).  Thus, the elements of the necessity affirmative defense are that: "(1) the person claiming

the defense was without blame in occasioning or developing the situation, and (2) the person reasonably believed that his [or her] conduct was necessary to avoid a greater public or private injury than that which might reasonably have resulted from his [or her] conduct." *People v. Janik*, 127 Ill. 2d 390, 399 (1989). The "defense is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable [citation], and the conduct chosen must promote some higher value than the value of literal compliance with the law [citation]." *Id.*

¶ 71    "For the defense of necessity to be applicable, defendant must admit he [or she] committed the offense since necessity merely justifies an otherwise criminal act." *People v. Gengler*, 251 Ill. App. 3d 213, 222 (1993); see also *People v. Landwer*, 166 Ill. 2d 475, 488-89 (1995) (to rely on entrapment affirmative defense, the "defendant must admit to committing all the elements of the charged offense," and there was no remaining dispute concerning his "mental state because the defendant ha[d] admitted it as part of raising the entrapment defense"; "after the entrapment defense is raised, the lesser offense of solicitation of aggravated battery does not meet the definition of an included offense," because "the same facts that are relevant to prove [the] defendant was entrapped into solicitation of murder do not establish that he solicited an aggravated battery.").

¶ 72    Here, defendant argues that he was *not* required to admit all the elements of the charged offense to assert the necessity defense. He cites no authority for this proposition and argues that *Gengler* and *Landwer* are limited to their facts. Defendant maintains that, in contrast, the necessity statute shows the legislature's intent that the justifiable conduct is not limited to a charged offense. Defendant reads the statue to include "lesser offenses that are included within the framework of the greater offense." In raising the necessity defense, he argues, he admitted the elements of the lesser offense of criminal trespass to vehicle without admitting all the elements of the greater

offense of possession of a stole motor vehicle. He contends that he admitted he took the Accord without the Sauberlichs' authorization, thus, acknowledging that the required elements for criminal trespass were satisfied. At the same time, he argues, he denied that he intended to permanently deprive them of their vehicle, where he drove it to the only gas station in Winslow, left the keys in the ignition, had jumper cables to start the car, and where the window to return it was very short because the police discovered the vehicle only a few days after he took it.

¶ 73    We reject defendants claim, as his positions are inconsistent and contrary to the statute. We disagree that *Landwer* and *Gengler* are neither controlling nor relevant authority. Neither case contains language reflecting that it is limited to the offenses involved therein. Furthermore, defendant's reading of the necessity statute is not reasonable. The statute's reference to "[c]onduct that would otherwise be *an offense*" (emphasis added), necessarily means the charged conduct/crime of which the State has the burden to prove all elements. Defendant reads it to mean any conduct, including lesser offenses. We decline to read this into the statute. It is an illogical reading of the statute to allow a defendant to essentially raise an affirmative defense to an uncharged offense. See *Palmer*, 2021 IL 125621, ¶ 53 (legislature does not intend absurd results).

¶ 74    In summary, the trial court did not err in refusing to give the jury the lesser-included-offense instruction.

¶ 75                              B. Prior Conviction

¶ 76    Next, defendant argues that the trial court erred in admitting his prior conviction. For the following reasons, we reject his argument.

¶ 77    The determination of whether a witness' prior conviction is admissible for impeachment purposes is within the trial court's discretion. *People Montgomery*, 47 Ill. 2d 510, 517-18 (1971);

- 18 -

see also *People v. Williams*, 173 Ill. 2d 48, 81 (1996). A trial court abuses it discretion only where no reasonable person would take the court's view. *Hall*, 195 Ill. 2d at 20.

¶ 78    "All relevant evidence is admissible, except as otherwise provided by law." Ill. R. Evid. 402 (eff. Jan. 1, 2011). Generally, evidence of a defendant's other crimes is not admissible to show a defendant's propensity to engage in criminal activity. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). However, where the defendant elects to testify, the State may impeach his or her credibility with evidence of a prior conviction. *People v. Tribett*, 98 Ill. App. 3d 663, 675 (1981). In *Montgomery*, the supreme court adopted the 1971 proposed draft of Rule 609 of the Federal Rules of Evidence. *Montgomery*, 47 Ill. 2d at 516-19. Congress subsequently enacted a different form of Rule 609, but the *Montgomery* rule continues to apply in the Illinois courts. *People v. Naylor*, 229 Ill. 2d 584, 596 (2008).

¶ 79    Illinois Rule of Evidence 609 (eff. Jan. 6, 2015) codified the *Montgomery* rule. Rule 609 states:

> "(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime, except on a plea of *nolo contendere*, is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the court determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice.
>
> (b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the

witness from confinement, whichever is the later date." Ill. R. Evid. 609(a), (b) (eff. Jan. 6, 2015).

¶ 80 "In conducting this balancing test, the trial judge should consider, *inter alia*, the nature of the prior conviction, its recency and similarity to the present charge, other circumstances surrounding the prior conviction, and the length of the witness' criminal record." *People v. Atkinson*, 186 Ill. 2d 450, 456 (1999). The evidence of the prior conviction must be excluded if the trial judge determines that the prejudice outweighs the probative value of admitting the evidence. *Id.* The entire *Montgomery* balancing test applies, and eligible grounds for impeachment are not limited to "only convictions for offenses that involve dishonesty or false statement." *Williams*, 173 Ill. 2d at 83. The trial court need not expressly conduct the *Montgomery* balancing test on the record. *People v. Mullins*, 242 Ill. 2d 1, 16 (2011).

¶ 81 Prior to trial, the State moved *in limine*, seeking to enter into evidence for impeachment purposes, if defendant were to testify at trial, defendant's Wisconsin conviction. At the hearing, the State noted that defendant had been convicted in April 2018 of substantial battery/intended bodily harm (which occurred in January 2018), a Wisconsin felony with a potential prison term of up to three years and six months. The State argued that defendant's credibility should be judged based on his testimony and the conviction, especially given the timeframe of the conviction and because it was relevant and admissible.

¶ 82 Defense counsel argued that, without further details on the crime, it was unclear if it was a felony in Illinois. Counsel also argued that the timing of the conviction rendered it inadmissible, because the offense occurred after the incidents in this case. Also, counsel asserted that it was not related to the charged conduct in this case, nor was it related to defendant's credibility. Rather,

the State's purpose was to show that defendant was a felon and was, therefore, guilty of the offense in this case. Thus, the conviction was more prejudicial than probative.

¶ 83    The trial court granted the State's motion and allowed defendant's prior conviction to be used for impeachment if the State provided proof of a certified or exemplified copy of the conviction showing that the conviction was for a felony and that the timing fit within the parameters of *Montgomery*. The court noted that, when individuals put their credibility on the line, it can be tested with previous convictions. Referencing the *Montgomery* test, the court stated that it requires a "weighing process" and that it believed "that when individuals have in the past committed crimes where they put their own sense of welfare above that of society is something that should be tested if it falls within that timeframe and it falls within that classification of cases."

¶ 84    At trial, during its rebuttal, the State submitted a certified and exemplified copy of defendant's Wisconsin conviction, and the trial court instructed the jury that it could use the prior conviction to consider defendant's credibility, but not as evidence of his guilt. Defendant challenged the court's ruling in his posttrial motion, which the trial court denied.

¶ 85    Here, defendant argues that the trial court "gave only lip service" to the *Montgomery* test, and its comments instead reflected that it was applying its own "blanket rule avoiding balancing." He contends that, merely because all felonies show societal disrespect and indicate a willingness to lie on the witness stand, trial courts should not tip the balance toward probative value over prejudicial impact. See *People v. Cox*, 195 Ill. 2d 378, 384 (2001). Defendant maintains that the court's personal belief in the admissibility of societal-disrespect convictions, without considering the unfairly prejudicial aspects of such a ruling, stands in stark contrast to *Montgomery*, which requires that both probative value and prejudicial impact be considered. He argues that the court's personal belief on the utility of impeaching a witness with prior societal disrespect convictions

was an irrelevant and improper basis upon which to rest a *Montgomery* ruling. Defendant also contends that the court did not recognize or give any consideration on the scale to the unfairly prejudicial aspects of allowing a prior conviction into evidence that might lead a jury to convict, not because of credibility determinations, but simply because defendant had a propensity to commit crime.

¶ 86 We conclude that the trial court did not abuse its discretion in granting the State's motion *in limine* and allowing it to introduce defendant's prior conviction. Defendant's entire defense consisted of his testimony, and, therefore, his credibility was a central issue in this case. *People v. Diehl*, 335 Ill. App. 3d 693, 704 (2002) (where a defendant's entire defense consisted of his own testimony, his credibility was a central issue). Also, he was convicted in Wisconsin only four months after he committed the offenses in this case. We disagree that the court's comments reflect that it failed to conduct a meaningful balancing test and "implicitly reject[ed]" the balancing test. Indeed, the court *explicitly* noted *Montgomery*'s "weighing process" and then commented that it believed that, "when individuals commit[ ] crimes where they put their own sense of welfare above that of society," that "should be *tested* if it falls within that time frame and it falls within that classification of cases." (Emphases added.) These comments do not reflect that the court rejected *Montgomery* or failed to balance the probative value of defendant's prior conviction against its prejudicial impact. Rather, they reflect that the court understood and intended to apply the test. The court did not explicitly conduct a balancing test here, but it was not required to do so. *Mullins*, 242 Ill. 2d at 16. Furthermore, we note that the court also issued a limiting instruction prior to the State's presentation of defendant's conviction. "Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *People v.*

*Wilmington*, 2013 IL 112938, ¶ 49. In all, there is no indication in the record that the court failed to balance the danger of unfair prejudice against the probative value of admitting the evidence.

¶ 87    Alternatively, we agree with the State that, even if the trial court erred in allowing his prior conviction into evidence, the error was harmless because the evidence of defendant's guilt was overwhelming. See *People v. Woodard*, 276 Ill. App. 3d 242, 245-46 (1995) (improper *Montgomery* impeachment is subject to harmless-error review, where the evidence of the defendant's guilt is overwhelming); see also *People v. Jackson*, 299 Ill. App. 3d 104, 114 (1998) (where evidence of guilt was overwhelming, prejudice caused by *Montgomery* error did not outweigh probative value of prior conviction in considering the defendant's credibility). Given defendant's assertion of the necessity defense and his trial testimony, the evidence of his guilt was overwhelming. Thus, any error in admitting the conviction was harmless.

¶ 88    In summary, we conclude that the trial court did not abuse its discretion in permitting the State to introduce defendant's Wisconsin conviction.

¶ 89                                III. CONCLUSION

¶ 90    For the reasons stated, we affirm the judgment of the circuit court of Stephenson County.

¶ 91    Affirmed.